[Civ. No. 1837.   Third Appellate District.—May 28, 1918.]

OSCAR MOORE, Plaintiff and Respondent, v. INDIAN SPRING CHANNEL GOLD MINING COMPANY (a Corporation), et al., Defendants and Respondents; CHARLES MUSHRUSH, Defendant and Appellant.

WAGE ACT—IMMEDIATE PAYMENT UPON DISCHARGE—PENALTY FOR FAILURE RECOVERABLE BY EMPLOYEE—CONSTITUTIONAL LAW—UNIFORM OPERATION OF GENERAL LAWS PROVISION NOT VIOLATED.—The act approved May 1, 1911 (Stats. 1911, p. 1268), and the amendment thereof approved April 28, 1915 (Stats. 1915, p. 299), providing

that whenever an employer discharges an employee, wages due and unpaid shall become payable immediately, and imposing a penalty for nonpayment recoverable by the employee, is not violative of article I, section 11, of the constitution, providing all general laws shall have uniform operation.

ID.—Passage of Local Law Provision not Violated.—Such act is not violative of article IV, section 25, subdivision 33, of the constitution, providing the legislature shall not pass local or special laws where a general law can be made applicable.

ID.—Due Process of Law Provision not Violated.—Such act is not violative of the fourteenth amendment to the federal constitution, providing no state shall deprive any person of life, liberty, or property without due process of law.

APPEAL from a judgment of the Superior Court of Butte County. H. D. Gregory, Judge.

The facts are stated in the opinion of the court.

Carleton Gray, George R. Davis, and William H. Carlin, for Appellant.

W. K. Hays, for Respondent.

CHIPMAN, P. J.—This is an action brought by plaintiff upon his own claim and certain claims assigned to him by his fellow-laborers, for work performed by them as miners.

The court found in favor of the plaintiff on his own and the assigned claims and "that defendant Charles Mushrush promised to pay each of said above-named persons at the rate of three and 50/100 dollars a day wages for eight hours work," no part of which has "ever been paid to either or any of said named persons."

The action was to recover not only the wages of the men, but also the penalty as provided by the act entitled, "An act providing for the time of payment of wages," approved May 1, 1911 (Stats. 1911, p. 1268), and the amendment thereof, approved April 28, 1915, in effect August 8, 1915 (Stats. 1915, p. 299).

The court found, in addition to the sums found due as wages, that there was due each of the several claimants a sum specifically found "as a penalty for nonpayment of wages." Judgment was accordingly entered in favor of plaintiff and against defendant Mushrush for the sum of $1,010.55 as wages

and the further sum of $1,184.15 as a penalty. The findings were in favor of the other defendants. The appeal is from the judgment by defendant Mushrush.

There was no controversy as to the amount due to these several claimants. The only question of fact being tried was whether all of the defendants were liable, and if not all, which of them. The court found as to each claim that the "service was rendered to the defendant Charles Mushrush at his special instance and request."

We have examined the testimony and documentary evidence in the case and are entirely satisfied that the court was justified in finding that defendant Mushrush is liable for the amount of these several claims. The only question open for discussion is the constitutionality of the act of 1911 as amended in 1915, imposing a penalty for nonpayment of the wages, the subject of the action.

Appellant contends that the act of 1911, as it was enacted and as amended, is in violation of section 11, article I, and subdivision 33 of section 25, article IV, of the constitution of this state, and also of the fourteenth amendment to the federal constitution. Section 11, article I, declares that "all laws of a general nature shall have a uniform operation." Section 25, article IV, provides that "the legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: . . . Thirty-third: In all other cases where a general law can be made applicable." Article XIV of the federal constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Section 1 of the act of 1911 is as follows: "Whenever an employer discharges an employee, the wages earned and unpaid at the time of such discharge shall become due and payable immediately. When any such employee not having a contract for a definite period quits or resigns his employment the wages earned and unpaid at the time of such quitting or resignation shall become due and payable five days thereafter.

"Sec. 2. All wages other than those mentioned in section 1 of this act earned by any person during any one month shall become due and payable at least once in each month and no

person, firm or corporation for whom such labor has been per-
formed, shall withhold from any such employee any wages so
earned or unpaid for a longer period than fifteen days after
such wages become due and payable; provided, however, that
nothing herein shall in any way limit or interfere with the
right of any such employee to accept from any such person,
firm or corporation wages earned and unpaid for a shorter
·period than one month.

"Sec. 3.    Any person, firm or corporation who shall violate
any of the provisions of this act shall be guilty of a mis-
demeanor and upon conviction thereof shall be punished by a
fine not to exceed five hundred dollars.

"Sec. 4.    None of the provisions of this act shall apply to
any county, city and county, incorporated city or town, or
other municipal corporation."

The act of 1911 was before the district court of appeal for
the first district in the *Matter of Crane,* 26 Cal. App. 22, [145
Pac. 733], and section 3 was held to be violative of section 15
of article I of the constitution, which provides that "no per-
son shall be imprisoned for debt in any civil action, on *mesne*
or final process, unless in cases of . . ."    The constitutional-
ity of the act otherwise was not considered.    Since that de-
cision, and possibly by reason of it, the legislature amended
section 3 (Stats. 1915, p. 299) to read in part as follows: "In
the event that any employer shall fail to pay, without abate-
·ment or deduction, within five days after the same shall be-
come due under the provisions of section one of this act, any
wages of any employee who is discharged or who resigns or
quits, as in said section one provided, then as a penalty for
such nonpayment the wages of such servant or employee shall
continue from the due date thereof at the same rate until
paid; or until an action therefor shall be commenced; pro-
vided, that in no case shall such wages continue for more than
thirty days; . . ."

Appellant expresses "difficulty in discovering any material
distinction between the two acts.    In the act of 1911," con-
tinues the brief, "the penalty is nothing more nor less than a
fine not exceeding five hundred dollars; while by the amend-
ment of 1915 the penalty is in effect a fine not exceeding thirty
times the servant's daily wage."    It seems to us that the dis-
tinction is obvious in this: the act of 1911 declares that a vio-
lation of its provisions is a crime for which the violator is

answerable to the state, while by the amendment he must compensate the wage-earner by way of penalty.

In the present case there was no dispute as to the facts. These laborers had been working for appellant several months at a daily wage, receiving their pay at the end of the month regularly at a time and at a wage agreed upon. The mine shut down at the end of August, 1915, and filled up with water and the laborers were discharged. Appellant, who had theretofore paid them their wages, failed and refused to pay for the month of August, and on September 29, 1915, the action was commenced, thus bringing the case within the terms of the act. No question arises as to the correctness of the amounts due each claimant as to wages earned and the penalty imposed.

The provisions of our constitution, relied upon by appellant, have many times and under many different legislative enactments been before the courts of review in this state, as, also, has the fourteenth amendment of the national constitution. That in certain cases special laws are permissible was shown in *City of Sacramento* v. *Swanston,* 29 Cal. App. 212, [155 Pac. 101], where the subject was given a somewhat extended treatment, and it was there held that under certain circumstances attorneys' fees were allowable in condemnation proceedings, although in that regard the statute is clearly special legislation. It is doubtless true, as was said in *Bruch* v. *Colombet,* 104 Cal. 347, [38 Pac. 45], that "no absolute, inflexible rule has ever been formulated, and probably never will be, by which to determine what departure from uniformity is permissible, and what will be fatal. The courts must determine each case as it arises, presuming in favor of the rightful exercise of the legislative power. Yet the inhibition should be enforced unless there is discoverable some reasonable ground for a distinction."

The courts have, however, announced certain governing principles which are more or less applicable to all legislation of this class. Perhaps as concise a statement of the rule as may be found is given in the *Matter of the Application of Miller,* 162 Cal. 687, 698, [124 Pac. 427, 430], as follows: "A law is general and uniform in its operation when it applies equally to all persons embraced within the class to which it is addressed, provided such class is made upon some natural, intrinsic, or constitutional distinction between the persons

composing it and others not embraced in it. It is not general or uniform and it makes an improper discrimination if it confers particular privileges or imposes peculiar restrictions or disabilities upon a class of persons arbitrarily selected from a larger number of persons, all of whom stand in the same relation to the privileges granted or burdens imposed, and between whom and the persons not so favored or burdened no reasonable distinction or substantial difference can be found justifying the inclusion of one and the exclusion of the other from such privileges or burdens. The difference on which the classification is based must be such as, in some reasonable degree, will account for or justify the peculiar legislation.''

The act in question, in imposing a penalty where the facts are as therein mentioned, is not unlike, in its operation, the sections of the Code of Civil Procedure—sections 732, 733, 735—which authorize the court to impose treble damages where a tenant commits waste; cuts down trees; and in cases of forcible entry and detainer. The constitutionality of these sections is not questioned. They are held not to be penal, but remedial. (*Jahns* v. *Nolting*, 29 Cal. 508, 513.) Such laws relate to matters of procedure, as to which the court said, in *Cohen* v. *Alameda*, 168 Cal. 265, 267, [142 Pac. 885, 886]: ''The legislative discretion as to the different modes of procedure or rules of practice to be prescribed for the numerous and various actions and proceedings allowed in courts of justice is very wide, and that its judgment on the question whether or not a particular provision shall be made for any class of cases, and as to the classification thereof, is not to be interfered with except for very grave causes and where it is clear beyond reasonable doubt that no sound reason for the legislative classification, and for the different provisions regarding the same, exists.''

The legislative authority in this class of laws is, however, usually referable to the police power, and if the act in question may be regarded as deriving its validity from such source, it is not without its restrictions and limitations. But here, too, as was said in *Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686, 694, [151 Pac. 398, 401, 10 N. C. C. A. 1]: ''The broad and all-pervading scope of this power makes a satisfactory definition of it impossible.'' For the purposes of the discussion in that case, Mr. Justice Sloss said: ''The police power is, we think, adequately and well described by the

supreme court of Washington in these words: 'By means of it, the legislature exercises a supervision over matters affecting the common weal and enforces the observance by each individual member of society of duties which he owes to others and the community at large. The possession and enjoyment of all rights are subject to this power. Under it, the state may "prescribe regulations promoting the health, peace, morals, education, and good order of the people, and legislate so as to increase the industries of the state, develop its resources and add to its welfare and prosperity." In fine, when reduced to its ultimate and final analysis, the police power is the power to govern.' (*State* v. *Clausen,* 65 Wash. 156, 177, [37 L. R. A. (N. S.) 466, 117 Pac. 1101].)'' But, as was further said by Mr. Justice Sloss: "The arbitrary taking of life, liberty, or property cannot, of course, be justified by referring the act to the police power. But if a given piece of legislation may fairly be regarded as necessary or proper for the protection of furthering of a legitimate public interest, the mere fact that it hampers private action in a matter which had therefore been free from interference is not a sufficient ground for nullifying the act." Examples are pointed out where vital legislative changes are of every-day occurrence. "The same may be said of employer and employees. The employment creates a status involving relative rights and obligations, and it is proper for the legislature, acting within the bounds of fairness and reason, to determine the nature, extent, and application of those rights and obligations."

Referring to the Workmen's Compensation Act, [Stats. 1913, p. 279], the constitutionality of which was under discussion, it was further said: "If the law-making body determines that one of the incidents of that relation shall be that the employer must compensate his employee for an accidental injury received in his service, an enactment to that end is neither arbitrary nor outside the scope of legislative authority." Acts similar to our Employers' Liability Act are in force in several states, and in all of them the law has been upheld against all attack on constitutional grounds. In effect this act makes certain employers liable to pay a stated sum of money to every employee who is injured while in their employ, whether or not the injury arose through the employers' fault. This compensation is based in part upon the wage of the employee and is paid during a period of the employee's

idleness and inability to serve the employer. It would be difficult to find a reason which would justify this law which may not be urged in support of the act in question. There is between the two laws this striking difference: the employers' liability act penalizes the employer though he has committed no fault or wrong. The payment of wages act fixes a penalty for the nonperformance of a duty the employer owes to his employee. It simply says to the employer, "You shall not have the services of your employee without making provision for the payment of his wages within a reasonable time after they are due, and if you default, you shall compensate him for your wrong."

In the case of *International Text Book Co.* v. *Weissinger,* 160 Ind. 349, [98 Am. St. Rep. 334, 65 L. R. A. 599, 65 N. E. 521], an act of the legislature of Indiana was before the court which provided that "every person employing any person to labor shall make weekly payments for the full amount due for such labor or service in lawful money of the United States to within six days or less of the time of such payment," [Acts 1899, c. 124], and the act also prohibits the assignment of future wages, to become due to employees from persons affected by the act. Weissinger assigned to plaintiff his wages to become due. The action was against Weissinger and his assignee who had accepted the order. It was contended that the act was in violation of the constitution of Indiana and of the fourteenth amendment of the federal constitution. The court said that the act unquestionably restricted the liberty of the citizen to enter into contracts which, in the absence of the statute, he would have the right to make. "Such a prohibition," said the court, "can be sustained only on the ground that some public interest is involved, and that it is of such a character as to render it a legitimate subject of legislative regulation or control. The wages of laborers have been the subject of legislative solicitude and action in this state for many years, and in a great variety of forms." The court instances a number of statutes to support its statement and points out the peculiar circumstances surrounding the day laborer which justify legislation specially designed for his protection. "If," said the court, "the legislature, in the exercise of its general police power, to secure the safety and welfare of the state may deprive the laborer and his employer of the right to contract for payment of wages in anything else than legal tender notes

or other lawful money [referring to decisions of the United States supreme court], we do not perceive why it may not, also, in the exercise of that power, prohibit the assignment of wages before they are earned. . . . The purpose of the legislation in each is to protect a large and important class of citizens from imposition, unfair dealing, and the consequences of their own improvidence. The act . . . is not subject to the objection of a partial or improper classification.''

A Kentucky statute [Ky. Stats. 1903, sec. 2739a, subsec. 1] required that all persons, corporations, etc., employing one or more persons in mining work, should within a stated number of days pay in lawful money the full amount of wages due such person or persons, ''unless prevented by an unusual casualty.'' The act declared a violation of its provisions to be a misdemeanor punishable by fine. In *Commonwealth* v. *Reinecke Coal Min. Co.*, 117 Ky. 885, [79 S. W. 287], defendant was indicted for violation of the act. Among other grounds of demurrer it was contended that the statute ''is class legislation, also special legislation, and not a just exercise of the police power,'' and hence unconstitutional. The court held ''that the statute in all its parts is valid.''

In volume 9, Federal Statutes Annotated, first edition, at page 462, are cited certain cases bearing upon the question here. In *St. Louis etc. R. R. Co.* v. *Paul*, 173 U. S. 409, [43 L. Ed. 746, 19 Sup. Ct. Rep. 421], affirming 64 Ark. 83, [62 Am. St. Rep. 154, 37 L. R. A. 504, 40 S. W. 705], it was held that: ''A statute entitled 'An act to provide for the protection of servants and employees of railroads,' [Acts Ark. 1889, p. 76], relating to the payment of unpaid wages without abatement or deduction on discharge of an employee, does not amount to deprivation of property, as the act is purely prospective in its operation. It does not interfere with vested rights, or existing contracts, or destroy, or sensibly encroach upon, the right to contract, although it imposes a duty in reference to the payment of wages actually earned, which restricts future contracts in the particular named.''

A Rhode Island statute [Laws 1891, c. 918, sec. 1], providing that ''every corporation, other than religious, literary, or charitable corporations . . . shall pay weekly the employees engaged in its business the wages earned by them to within nine days of the date of such payment, unless prevented by inevitable casualty,'' was held valid. (*State* v. *Brown etc.*

*Mfg. Co.,* 18 R. I. 16, [17 L. R. A. 856, 25 Atl. 246].) See the question considered in *Ex parte Stephan,* 170 Cal. 48, [Ann. Cas. 1916E, 617, 148 Pac. 196]; *Ex parte Lichtenstein,* 67 Cal. 359, [56 Am. Rep. 713, 7 Pac. 728].

There has been a pronounced tendency in state and national legislation for many years, not only to ameliorate the working conditions of the wage-earner, but to safeguard him in his relations to his employer in respect of hours of labor and the compensation to be paid for his labor. In the controversies that have arisen between capital and labor, the public conscience has become awakened to the fact that the public safety and welfare demand more enlightened laws governing the relation of employer and employee—laws which are designed to secure to the latter a reasonable wage, to provide, where practicable, for the enforcement of payment by way of liens on the product of his labor, to exempt from execution a part of his earnings, to give him sanitary and otherwise safe surroundings while employed and the like.

Does the act in question apply equally to all persons embraced within the class to which it is addressed, and is such class made upon some natural, intrinsic, or constitutional distinction? If an affirmative answer may be given, the law is general and uniform in its operation and valid. (*Application of Miller,* 162 Cal. 687, [124 Pac. 427].) The act refers to all wage-earners, designated as employees, as the class referred to, and it unquestionably applies equally to all of the class.

Respondent quotes from an editorial in a responsible journal of January 22, 1916, the "Saturday Evening Post," a statement which we think not far from the truth: "Probably two-thirds of the inhabitants of the United States live out of a pay envelope—that is, on wages or on salaries that are only wages under a polite name. The yearly wage bill of the country has been estimated at fourteen billion dollars, which we take to be conservative." A very large per cent of those persons are day laborers, the greater part of whose earnings are necessarily paid out to them from day to day or week to week in the support of themselves and their families; their requirements are often obtained on credit and must be promptly met or the wage-earner loses his credit and sometimes his job; in many cases, he is denied credit and must pay cash. Delay of payment or loss of wages results in deprivation of the necessities of life, suffering inability to meet just obligations to

others, and, in many cases may make the wage-earner a charge upon the public. It cannot be disputed that the multitudinous and important enterprises which constitute a characteristic feature of the industrial activities around us are absolutely dependent for their successful operation upon the day labor of the wage-earner. Many of these enterprises directly contribute to the welfare of the public and are necessary to the public convenience and safety. It is not to be expected that the laborer upon whose service these industries depend will give his service without assurance of receiving the reward promised for such service, and any law whose object is to give to the laborer some further assurance that he will be promptly paid for his labor, in addition to the employer's promise, would seem to be reasonable, especially as the object is to induce, if not to compel, the employer to keep faith with his employee and imposes a penalty only when he commits a wrong which not only injures the employee but is an injury to the public in its tendency to deprive the public of an incidental benefit which comes from the employee's labor. The law imposes no unreasonable burden upon the employer, for, operating as it does in the future and disturbing no vested right, he must, and it is but fair that he should, make provision to pay his employee before hiring him, failing in which he should pay the penalty. Many enterprises require the services of large numbers of men—the numbers shifting from day to day—some being discharged and others taken on the job. It is common knowledge that a refusal to pay discharged men under such circumstances would tend to create breaches of the peace and disturb the public tranquillity. The intention of the penalty imposed by the act in question is to make it to the interest of the employer to keep faith with his employees and thus avoid injury to them and possible injury to the public at large.

The act very properly provides that when an employee is discharged by his employer, his wages earned and unpaid shall become immediately due. If the employment is not for a definite period and he quits his employment, the act gives the employer five days to pay the wages earned and unpaid. We see nothing unreasonable in this provision, for the right of the employee to quit work, where there is no contract for a definite period, is as undeniable as the right of the employer to discharge his employee.

Respondent cites a very ancient authority not inappropriate: "Thou shalt not oppress an hired servant that is poor and needy, whether he be of thy brethren, or of thy strangers that are in thy land within thy gates.

"At his day shalt thou give him his hire, neither shall the sun go down upon it; for he is poor, and setteth his heart upon it; lest he cry against thee unto the Lord, and it be sin unto thee." (Deuteronomy: xxiv, 15.)

We can discover no ground for holding the act to be violative of any provision of our constitution or that it violated the fourteenth amendment of the national constitution.

The judgment is, therefore, affirmed.

Hart, J., and Burnett, J., concurred.