[No. S129476. July 10, 2006.]

AMANZA SMITH, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
L'OREAL USA, INC., Real Party in Interest.

78

**COUNSEL**

Steven S. Elster; Glancy, Binkow & Goldberg, Lionel Z. Glancy, Kevin F. Ruf, Avi Wagner; Cyrus & Cyrus, Cyrus Nownejad; Law Offices of Steven Rubin and Steven Rubin for Petitioner.

Rukin Hyland Doria & DuFrane and Peter Rukin for California Employment Lawyers Association as Amicus Curiae on behalf of Petitioner.

Ivey, Smith & Ramirez, Jean-Claude André; Becky Lyn Monroe and Kevin Richard Kish for Bet Tzedek Legal Services, Asian Pacific American Legal Center of Southern California, Korean Immigrant Workers Advocates, La Raza Centro Legal and Stanford Community Law Clinic as Amici Curiae on behalf of Petitioner.

Steven S. Elster for Clergy and Laity United for Economic Justice as Amicus Curiae on behalf of Petitioner.

H. Thomas Cadell, Jr., as Amicus Curiae on behalf of Petitioner.

Cynthia L. Rice and Julia Montgomery for California Rural Legal Assistance Foundation, Maintenance Cooperative Trust Fund, Legal Aid Society of Los Angeles, Legal Aid Society-Employment Law Center and Asian Law Caucus, Inc., as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Morgenstein & Jubelirer, William J. Carroll, Bruce A. Wagman and Bita A. Karabian for Real Party in Interest.

Sefarth Shaw, Kenneth D. Sulzer and Thomas R. Kaufman for American Staffing Association as Amicus Curiae on behalf of Real Party in Interest.

Mitchell Silberberg & Knupp and Lawrence A. Michaels for The Employers Group as Amicus Curiae on behalf of Real Party in Interest.

Akin Gump Strauss Hauer & Feld, Rex S. Henke and Jessica M. Weisel for New Avalon, Inc., as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

**BAXTER, J.**—Section 201 of the Labor Code[1] provides that if an employer "discharges" an employee, wages earned and unpaid at the time of discharge are due and payable immediately. Under section 203, an employer's willful failure to pay wages to a "discharged" employee in accordance with section 201 subjects the employer to penalties.

---

[1] Unless otherwise specified, all further statutory references are to this code.

The question presented is whether the discharge element of these two statutes requires an involuntary termination from an ongoing employment relationship, such as when an employer fires an employee, or whether this element also may be met when an employer releases an employee after completion of a specific job assignment or time duration for which the employee was hired. Application of settled statutory construction principles leads us to conclude the statutory discharge element contemplates both types of employment terminations.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Amanza Smith was working as a salesperson in a Beverly Hills boutique when a representative of defendant L'Oreal USA, Inc., approached her and asked if she would like to be a "hair model" at an upcoming show featuring L'Oreal products and a hair stylist. After plaintiff attended a modeling call, defendant agreed to pay her $500 for one day's work at the show.

At the show, plaintiff sat on a stage in front of an audience as her hair was colored and styled. She then walked a runway a few times. Plaintiff stayed at the show until she was told she could leave. Defendant did not immediately pay plaintiff the $500 in wages it owed her, but waited over two months to do so.

Plaintiff filed the instant lawsuit against defendant on behalf of herself and all other similarly situated models who worked for defendant. The complaint contains causes of action for conversion, fraud and deceit, violation of Business and Professions Code section 17200, violation of sections 201 and 203, breach of contract, and negligent misrepresentation. The complaint also includes a cause of action "on behalf of the public" for violation of Business and Professions Code section 17200. As relevant here, plaintiff alleges defendant violated section 201 by failing to pay her and the other models their wages immediately upon discharge from employment. Pursuant to section 203, she seeks penalties against defendant in the amount of $15,000 for herself, representing 30 days of the applicable wage rate ($500), and penalties for each similarly situated model according to proof.

Defendant moved for summary adjudication of all causes of action except conversion and breach of contract. For purposes of its motion, defendant conceded plaintiff was its employee and not an independent contractor, and it did not argue its wage payment timing was in accordance with the parties' agreement. Defendant, however, contended plaintiff could not recover penalties under section 203 because the job termination that occurred when she completed her one-day work assignment did not constitute a "discharge" or

"layoff" that triggered section 201's requirement for immediate wage payment. The trial court agreed and granted defendant's motion. Plaintiff filed a petition for writ of mandate. The Court of Appeal initially issued an order to show cause why the petition should not be granted, then denied the petition in a published opinion.

We granted plaintiff's petition for review.

## DISCUSSION

■  The public policy in favor of full and prompt payment of an employee's earned wages is fundamental and well established: " 'Delay of payment or loss of wages results in deprivation of the necessities of life, suffering inability to meet just obligations to others, and, in many cases may make the wage-earner a charge upon the public.' " (*Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 326 [19 Cal.Rptr. 492, 369 P.2d 20].) California has long regarded the timely payment of employee wage claims as indispensable to the public welfare: "It has long been recognized that wages are not ordinary debts, that they may be preferred over other claims, and that, because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due. [Citations.] An employer who knows that wages are due, has ability to pay them, and still refuses to pay them, acts against good morals and fair dealing, and necessarily intentionally does an act which prejudices the rights of his employee." (*In re Trombley* (1948) 31 Cal.2d 801, 809–810 [193 P.2d 734]; see *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1147 [37 Cal.Rptr.2d 718] [statute criminalizing prompt payment violations shows "the policy involves a broad public interest, not merely the interest of the employee"].) We recently identified sections 201 and 203 as implementing this fundamental public policy regarding prompt wage payment. (See *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 360 [127 Cal.Rptr.2d 516, 58 P.3d 367].)

In the proceedings below, defendant conceded for purposes of summary adjudication that it had an employer-employee relationship with plaintiff as sections 201 and 203 require. The central dispute here is whether defendant effectuated a "discharge" of plaintiff within the contemplation of these statutes. Plaintiff contends that sections 201 and 203 protect employees such as herself who are hired for a particular job assignment or time duration, and that the statutory discharge element is met when the employment relationship is terminated upon completion of the specified employment. Conversely, defendant, like the Court of Appeal below, interprets the discharge element to mean an employer must affirmatively dismiss an employee from an ongoing

employment relationship, for example, by firing or laying off the employee. The issue is one of statutory construction that is subject to our independent review. (See *Smith v. Rae-Venter Law Group, supra,* 29 Cal.4th at p. 357.)

In construing a statute, our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) We begin with the language of the statute, giving the words their usual and ordinary meaning. (*Ibid.*) The language must be construed "in the context of the statute as a whole and the overall statutory scheme, and we give 'significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " (*People v. Canty* (2004) 32 Cal.4th 1266, 1276 [14 Cal.Rptr.3d 1, 90 P.3d 1168].) In other words, " 'we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." [Citation.]' " (*In re Marriage of Harris* (2004) 34 Cal.4th 210, 222 [17 Cal.Rptr.3d 842, 96 P.3d 141].) If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. (*Day, supra,* 25 Cal.4th at p. 272.) In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences. (*Ibid.*)

At issue here is the first sentence of section 201, subdivision (a): "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."[2] Also relevant is the part of section 203 providing: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days. . . ." (§ 203, 1st par.)

---

[2] Section 201, subdivision (a), provides in full: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately. An employer who lays off a group of employees by reason of the termination of seasonal employment in the curing, canning, or drying of any variety of perishable fruit, fish or vegetables, shall be deemed to have made immediate payment when the wages of said employees are paid within a reasonable time as necessary for computation and payment thereof; provided, however, that the reasonable time shall not exceed 72 hours, and further provided that payment shall be made by mail to any employee who so requests and designates a mailing address therefor."

The remainder of section 201 pertains to discharges in state employment. (§ 201, subds. (b), (c).)

Although each statute specifies its applicability when a "discharge" of an employee occurs, neither statute provides a definition for that term. Nor is the term elsewhere defined in the Labor Code or in the regulations promulgated by the Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE), the agency charged with interpreting and enforcing state wage and hour laws. (§§ 79, 82, 90.5, 95, subd. (a).)

Relying in part on legal and nonlegal dictionaries to ascertain the most commonly understood meaning of "discharge," the Court of Appeal concluded the term refers only to "the affirmative dismissal of an employee by an employer from *ongoing* employment and does not include the completion of a set period of employment or a specific task." (Italics added.) We are not convinced.

While various dictionaries indicate a "discharge" often refers to an employer's dismissal of an employee from employment that otherwise would be ongoing, e.g., a firing (e.g., Black's Law Dict. (8th ed. 2004) p. 495; Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 356), these sources do not categorically limit the term to that type of employment termination or separation. Nor do they purport to define the term as excluding situations where employment is terminated upon the completion of a specific job assignment or time duration.

Indeed, another commonly understood meaning of "discharge" includes the action of an employer who, having hired an employee to work on a particular job or for a specific term of service, formally releases the employee and ends the employment relationship at the point the job or service term is deemed complete. (E.g., Merriam-Webster's Collegiate Dict., *supra*, at p. 356 ["discharge" may mean "to release from an obligation" or "to release from service or duty <~ a soldier>"]; Webster's 3d New Internat. Dict. (2002) p. 644 [reflecting that one meaning of "discharge," in its verb form, is "to end formally the service of: release from duty" and that one meaning of the noun "discharge" is "a release or dismissal esp. from an office or employment <the ~ of a worker>"]; American Heritage Dict. of the English Language (4th ed. 2000) p. 515 [defining "discharge" as including: "Dismissal or release from employment, service, care, or confinement"].) In this regard, even though "discharge" includes the meaning "to dismiss from employment" (e.g., Merriam-Webster's Collegiate Dict., *supra*, at p. 356), the word "dismiss," in turn, is commonly understood to mean "*to permit* or cause *to leave*" (e.g., *id.* at p. 360 [italics added]).

The very nature of an employer-employee relationship supports a more inclusive construction, particularly as to cases where an employer hires an employee for a specific job assignment, for generally it is up to the employer,

not the employee, to direct how the assignment is to be executed and to determine when it has been completed. (See *Zaremba v. Miller* (1980) 113 Cal.App.3d Supp. 1, 5 [169 Cal.Rptr. 688] [" 'most important factor' " in determining whether one is an employee, as opposed to an independent contractor falling outside the protective scope of sections 201 and 203, is the right of the hirer to " 'control the manner and means of accomplishing the result desired' "].) Consistent with the manner in which assignment-based employer-employee relationships typically function, plaintiff here stayed at the hair show until defendant told her she was free to leave and thereby released her from any further hair modeling and show obligations. The term "discharge," then, reasonably may encompass either or both of the meanings the parties have ascribed to it.

Mindful that statutory terms must not be viewed in isolation, we look to the legislative scheme as a whole, including other related statutes and a provision within section 201 itself, in order to glean the proper construction.

Sections 201 and 203 are part of article 1 (General Occupations) of chapter 1 (Payment of Wages) of part 1 (Compensation) of division 2 (Employment Regulation and Supervision) of the Labor Code. Article 1 also includes section 202, which sets forth the wage payment rule for cases in which an employee without a written contract for a definite period quits his or her employment. Under section 202, all earned and unpaid wages generally are due and payable "not later than 72 hours" after the employee quits.[3] Together, sections 201 and 202 direct employers to promptly pay wages when employment is terminated by discharge, or by resignation if no requisite written contract exists, with section 203 providing for penalties when the employer willfully fails to do so.

Article 1 also contains provisions recognizing that, in certain industries, extenuating circumstances may require additional time for calculating and distributing earned wages when an employee is discharged or laid off. Section 201, for example, provides that an employer who "lays off a group of employees *by reason of the termination of seasonal employment* in the curing, canning, or drying of any variety of perishable fruit, fish or vegetables, *shall be deemed to have made immediate payment*" by paying the wages within a reasonable time as necessary to compute and pay such wages, in no event exceeding 72 hours. (§ 201, subd. (a), italics added; see *ante*, fn. 2.)

---

[3] Section 202 provides in relevant part: "(a) If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting. . . ."

Following a pattern similar to section 201, section 202's other subdivisions relate to resignations in state employment. (§ 202, subds. (b), (c).)

Similarly, section 201.5 provides that, in the motion picture industry, when the terms of employment are such as to require "special computation" to ascertain the wages due, an employer *"shall be deemed to have made immediate payment of wages within the meaning of Section 201"* in a "layoff" situation if it pays wages by the next regular payday following the layoff, and in a "discharge" situation if it pays wages within 24 hours after the discharge, excluding weekend days and holidays. (§ 201.5, 1st par., italics added.) Section 201.5 explains that "special provision" must be made for this industry because employees work at various locations that often are far removed from the employer's principal administrative offices, "and the unusual hours of their employment in this industry is *often geared to the completion of a portion of a picture,* which time of completion may have no relation to normal working hours." (§ 201.5, 2d par., italics added.)

Finally, section 201.7 provides that an employer in the oil drilling business *"shall be deemed to have made immediate payment within the meaning of Section 201"* if it pays wages within a reasonable time as necessary not exceeding 24 hours after the discharge, excluding weekend days and holidays. (§ 201.7, 1st par., italics added.) Like section 201.5, section 201.7 explains that "special provision" must be made for oil drilling businesses because the various locations of employment may make "the computation and payment of wages on an immediate basis unduly burdensome." (§ 201.7, 2d par.)

These exceptions to section 201's immediate payment requirement, especially section 201.5 and the exception within section 201 itself, strongly imply the statutory discharge element is not limited to dismissals from ongoing employment. Notably, these exceptions pertain to situations anticipating the employees will complete the particular job assignment or period of service for which they were hired—i.e., when a discharge or a layoff occurs "by reason of the termination of seasonal employment" (§ 201, subd. (a)) or upon "completion of a portion of a [motion] picture" (§ 201.5, 2d par.). Redefining what "immediate payment" means, vis-à-vis section 201, and articulating justifications for an extended payment period in the context of these selected industries, makes little sense if section 201's immediate payment requirement does not, in the first instance, generally apply to employment terminations resulting from completion of specified job assignments or periods of service.

■ To confirm the proper interpretation of sections 201 and 203, we next examine the ostensible objects to be achieved and the legislative history. We observe the Legislature first enacted an immediate wage payment provision

similar to section 201 in 1911.[4] At the time, the Bureau of Labor Statistics (BLS) was the agency that recommended and enforced such wage-related legislation. (See Stats. 1883, ch. XXI, pp. 27–30 ["An Act to establish and support a Bureau of Labor Statistics"].) Legislation charged the BLS Commissioner with the duties to "collect . . . and present, in biennial reports to the Legislature, statistical details, relating to all departments of labor in the State," including statistics and all other information relating to labor that the commissioner deemed essential to further the legislative objective, "together with such strictures on the condition of labor and the probable future of the same" as the commissioner deemed "good and salutary to insert in his biennial reports." (Stats. 1883, ch. XXI, § 3, pp. 28–29.) We therefore consult these biennial reports for whatever light they may shed regarding the purpose of the wage payment legislation. (See *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 309 [58 Cal.Rptr.2d 855, 926 P.2d 1042] [although not necessarily controlling, the contemporaneous administrative construction of a statute by those charged with its enforcement and interpretation is entitled to great weight].)

In 1910, BLS published a biennial report that included a section on "Wage Payments," a subject the BLS Commissioner described as being "of paramount importance" at that time. (BLS, 14th Biennial Rep.: 1909–1910 (1910) p. 12.) As part of its report, BLS recommended: "A reasonable provision should be made for the immediate payment following dismissal of an employee, or *at the conclusion of specified employment.*" (*Id.* at p. 43, italics added.) In addressing the need for this and other wage-related legislation, BLS emphasized the unrest, dissatisfaction, and hardship caused by the circumstance that a number of employers were requiring discharged employees to travel long distances to collect their wages, and that in many instances, employers were failing to honor their wage obligations for another 30 to 90

---

[4] The first version of the statute that later became section 201 was enacted in 1911. (Stats. 1911, ch. 663, § 1, p. 1268.) After the 1911 act was found to violate a state constitutional provision that prohibited imprisonment for debt in a civil action, on mesne or final process, unless in cases of fraud (*In re Crane* (1914) 26 Cal.App. 22, 25–26 [145 P. 733] [under the act, mere violation of the immediate wage provision was a misdemeanor]), the Legislature amended the act in 1915 to adopt a civil penalty and to require willfulness and ability to pay as elements supporting a criminal sanction. (Stats. 1915, ch. 143, § 1, p. 299.) The amended statute survived constitutional challenge. (*Moore. v. Indian Spring etc. Min. Co.* (1918) 37 Cal.App. 370, 372, 380–381 [174 P. 378] (*Moore*).) In 1919, the Legislature repealed the existing law but adopted essentially the same provisions as part of "An act to regulate the payment of wages or compensation for labor or service in private employments . . . ." (Legis. Counsel's Dig., Stats. 1919, ch. 202, p. 294.) Finally, in 1937, when the Legislature established the Labor Code, the 1919 provision requiring immediate payment upon discharge was adopted as section 201. (Stats. 1937, ch. 90, p. 197.)

days. (*Ibid.*)[5] This concern was relevant to both types of discharged employees BLS referenced (those fired *and* those released after conclusion of specified employment), for in either situation, traveling long distances and waiting for the delayed payment of earned wages would frustrate the employee's ability to obtain and maintain other employment. In 1911, the Legislature enacted the first law requiring prompt wage payment, utilizing the term "discharges" and other wording nearly identical to that appearing in section 201 today.[6]

In 1923, BLS identified *Moore, supra,* 37 Cal.App. 370, as an important court decision that warranted mention. (BLS, 20th Biennial Rep.: 1921–1922 (1923) p. 36.) While noting the only issue in the case was the constitutionality of the 1911 immediate wage payment law as amended in 1915 with regard to the criminal sanction (see *ante,* fn. 4), BLS found significant *Moore*'s conclusion in dictum that laborers employed on a day-to-day basis were particularly in need of these laws: " 'It is not to be expected that the laborer upon whose service these industries depend will give his service without assurance of receiving the reward promised for such service, and any law whose object is to give to the laborer some further assurance that he will be promptly paid for his labor, in addition to his employer's promise, would seem to be reasonable, especially as the object is to induce, if not to compel, the employer to keep faith with his employee, and imposes a penalty only when he commits a wrong which not only injures the employee but is an injury to the public in its tendency to deprive the public of an incidental benefit which comes from the employee's labor. The law imposes no unreasonable burden upon the employer, for, operating as it does in the

---

[5] BLS explained: "Instances are numerous of the manifest unfairness to employees, which is practiced by some employers, in requiring that the wage earner travel long distances in order to collect the amount due. In many of these cases the employee finds, upon arrival at the point at which payment was expected, that the demand will not be honored until after a lapse of a period of from thirty to ninety days. . . . [¶] This condition tends to develop a spirit of unrest and dissatisfaction, demanding immediate remedial legislation, which can not be too strongly urged. The numerous cases that have come within the observation of [BLS] show conclusively the hardship that has been worked upon employees, especially the manual labor class, and this applies not only to men who have become dissatisfied with the character and condition of the labor, but to men who have been discharged for valid or invalid reasons. In numerous instances these men have been absolutely refused adequate evidence of the wage earned and due. . . . [¶] These complaints are not confined to any particular locality, but are general throughout those portions of the State employing temporary labor, particularly in construction work." (BLS, 14th Biennial Rep., *supra,* at pp. 43–44.)

[6] The 1911 act stated in relevant part: "Whenever an employer discharges an employee, the wages earned and unpaid at the time of such discharge shall become due and payable immediately. When any such employee not having a contract for a definite period quits or resigns his employment the wages earned and unpaid at the time of such quitting or resignation shall become due and payable five days thereafter." (Stats. 1911, ch. 663, § 1, p. 1268.) As indicated, section 202 is the provision that currently addresses prompt wage payment when an employee quits or resigns.

future, and disturbing no vested right, he must, and it is but fair he should, make provision to pay his employee before hiring him, failing in which he should pay the penalty. Many enterprises require the services of large numbers of men—the numbers shifting from day to day—some being discharged and others taken on the job. It is common knowledge that a refusal to pay discharged men under such circumstances would tend to create breaches of the peace and disturb the public tranquility. The intention of the penalty imposed by the act in question is to make it to the interest of the employer to keep faith with his employees and thus avoid injury to them and possible injury to the public at large.' " (20th Biennial Rep., *supra*, at p. 36, quoting *Moore*, *supra*, 37 Cal.App. at p. 380.) In quoting this passage approvingly, BLS demonstrated its relatively contemporaneous understanding that the 1915 wage payment legislation, consistent with the original 1911 legislation BLS had recommended, applied to day laborers whose employment "discharge" at the end of the day would not necessarily result from a "firing" or other involuntary termination. Just as significant, the passage acknowledged the public policy reasons supporting an immediate wage payment requirement, and those reasons appeared equally valid for both types of employees.

Through its biennial reports, BLS consistently emphasized the success of, and continued need for, wage payment legislation to protect working men and women from exploitative employers and to alleviate the predicament of discharged employees and quitting employees who were unable to promptly obtain the wages they earned. (E.g., BLS, 16th Biennial Rep.: 1913–1914 (1914) p. 15; BLS, 15th Biennial Rep.: 1911–1912 (1912) p. 9.) In reviewing the particular reports both sides have identified as relevant, however, we find no instance in which BLS purported to distinguish between employees who were fired or otherwise dismissed from ongoing employment and those who were released after completing their agreed-upon job assignments or terms of service. Certainly nothing in these reports indicated a recognition that the consequences of delayed or withheld wages were dissimilar for these different categories of employees. Nor was there any suggestion that fired employees were more economically or socially vulnerable as a result of deferred wage payment, or otherwise more deserving of immediate wage payment, than those employees who were not fired but released when their work was deemed completed. To the contrary, the passage BLS found significant within *Moore*, *supra*, 37 Cal.App. at page 380, reflects there was no perception of such a distinction. Accordingly, it is not surprising, in light of the important public policy at stake, that the Legislature, rather than adopting a narrower construction of the statutory term "discharge" in response to the more inclusive construction reflected in the BLS biennial reports, instead undertook to enact only limited exceptions to the immediate payment requirement in three specified industries. (See Stats. 1947, ch. 769, § 1 p. 1849 [amending

§ 201 to address group layoffs occurring "by reason of the termination of seasonal employment"]; Stats. 1957, ch. 1118, § 1, p. 2419 [adding § 201.5]; Stats. 1980, ch. 440, § 1, p. 925 [adding § 201.7].)

■ In light of the above, construing the immediate payment requirement as applying to both types of discharges appears to (1) be consistent with the statutory language and history; (2) better reflect the understanding of the agency originally charged with recommending enactment of such remedial legislation and with its enforcement;[7] and (3) more broadly advance the purpose of the legislation to ensure that discharged employees do not suffer deprivation of the necessities of life or become charges upon the public. Accordingly, we conclude an employer effectuates a discharge within the contemplation of sections 201 and 203, not only when it fires an employee, but also when it releases an employee upon the employee's completion of the particular job assignment or time duration for which he or she was hired.

In construing the statutory discharge element to require the firing or layoff of an employee from ongoing employment, the Court of Appeal relied in part on *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479 [59 Cal.Rptr.2d 20, 926 P.2d 1114], in which we stated: "In the employment law context, the usual and ordinary meaning of the term 'discharge' is to terminate employment." (*Id.* at p. 493.) *Romano*, however, examined the discharge issue in the context of determining when the statute of limitations begins to run in a wrongful termination case brought under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.). Because *Romano* did not involve a wage-related claim and did not purport to equate a discharge with a firing for all purposes, it bears little relevance here. (See also *Stephens v. County of Tulare* (2006) 38 Cal.4th 793 [43 Cal.Rptr.3d 302, 134 P.3d 288] [construing meaning of phrase "dismissed . . . for disability" contained in Gov. Code, § 31725].)

Given the lack of relevant California precedent,[8] the Court of Appeal also relied on several Arkansas and Louisiana authorities to bolster its construction

---

[7] In 1976, DLSE ultimately succeeded to the duties, powers, purposes, and responsibilities that originally resided with the BLS Commissioner, including the power to interpret and enforce state wage and hour laws. (Stats. 1976, ch. 746, § 16, p. 1777, adding § 82; see also Stats. 1976, ch. 746, §§ 12, 13, p. 1777, repealing and reenacting § 79; §§ 90.5, 95, subd. (a).) In a letter to this court, the assistant chief counsel to the Labor Commissioner (the chief of DLSE) represents that the "Labor Commissioner has uniformly held, where appropriate, that an employee who is let go by the employer, whether fired, laid off for an indefinite term, or because the job was for a fixed period of time and ended, must be paid in accordance with section 201, at the time of 'discharge.' " Although defendant appears to dispute this representation, it fails to cite any material reflecting a contrary position taken by the Labor Commissioner.

[8] Courts in two cases permitted recovery of section 203 penalties where employees had been hired for a specific project. (*Road Sprinkler Fitters Local Union No. 669 v. G & G Fire*

of sections 201 and 203. (See, e.g., *Missouri Pacific R. Co. v. Clement* (1944) 207 Ark. 389 [181 S.W.2d 240, 242]; *Chicago, R.I. & P. Ry. Co. v. Russell* (1927) 173 Ark. 398 [292 S.W. 375, 376]; *Smith v. Dishman & Bennett Speciality Co.* (La.Ct.App. 2002) 805 So.2d 1220; *Franklin v. Ram, Inc.* (La.Ct.App. 1991) 576 So.2d 546; *Collins v. Joseph* (La.Ct.App. 1971) 250 So.2d 796.) That reliance was misplaced. While those authorities may stand for the proposition that a "discharge" under Louisiana and Arkansas law excludes termination of a limited employment, they are unpersuasive here in light of the entire California statutory scheme and its legislative history.

We next address a contention made by New Avalon, Inc. (New Avalon), appearing as amicus curiae in support of defendant. New Avalon generally agrees that BLS's biennial reports are properly considered as part of the relevant legislative history. However, based on one such report (see BLS, 19th Biennial Rep.: 1919–1920 (1920) p. 38), New Avalon argues that certain legislation enacted in 1913 to regulate the wage payment of seasonal Alaska cannery workers would have been superfluous if the discharge language in the 1911 act covered seasonal employees whose employment terminations were not involuntary. We disagree.

The BLS biennial reports reflect the 1913 legislation was enacted to address the serious problem that large numbers of cannery workers were returning from Alaska to San Francisco at the end of the salmon season with little or no money due them after a season's work, primarily because significant deductions were taken out of their wages for gambling debts, liquor, and food.[9] (BLS, 15th Biennial Rep., *supra*, at pp. 51–52.) To address

---

*Sprinklers, Inc.* (2002) 102 Cal.App.4th 765, 779–780 [125 Cal.Rptr.2d 804] [union, under an assignment of rights, could collect penalties where employer failed to pay all wages due to workers upon their termination from employment]; *Zaremba v. Miller, supra,* 113 Cal.App.3d at p. Supp. 5 [model employed for a two-hour assignment was an "employee" and therefore eligible for penalties].) Neither case, however, involved a dispute regarding the discharge element of section 201. Another decision suggested that sections 201 and 203 "refer by their terms to a situation where an individual workman is . . . 'fired,' " and not where seasonal work being done by an entire crew is terminated, but did so in the context of addressing a sufficiency-of-the-evidence claim regarding the nature of an employee's death. (*Argonaut Ins. Co. v. Industrial Acc. Com.* (1963) 221 Cal.App.2d 140, 145 [34 Cal.Rptr. 206].)

[9] BLS described how men employed in the Alaska salmon canneries were hired and paid: "These men are hired in San Francisco during the months of March and April and are shipped north to work in the salmon canneries, located on the coast of Alaska. They are returned during the months of August and September and are paid off in San Francisco for the full season's work. *At the time these men are paid off the real trouble begins.* Innumerable disputes arise on account of the deductions that are made for various items—principally for gambling debts, liquor and food." (BLS, 15th Biennial Rep., *supra*, at p. 51, italics added.) BLS referred to the situation as "a grave one, for it must be borne in mind that, when you cast several thousand irresponsible men who are penniless—or almost penniless—adrift in [San Francisco], after they have toiled for five or six months—you add a large factor to the criminal element of the community." (*Id.* at p. 52.)

these workers' claims of "false or exorbitant deductions on their wages" (*id.* at p. 52), the 1913 legislation authorized the BLS Commissioner to hear and decide all seasonal labor wage disputes and to require the commissioner to "allow or reject any deductions made from such wages; *provided, however,* that he shall reject all deductions made for gambling debts incurred by the employee during such employment and for liquor sold to the employee during such employment." (Stats. 1913, ch. 198, § 3, p. 343.) If anything, the operative terms and legislative history of the 1913 legislation together suggest that while the cannery workers were being paid promptly at the end of their seasonal employment in conformity with the 1911 act, the 1913 law was necessary to address the special problem that exorbitant deductions for gambling debts and liquor were diminishing these workers' wages. (See BLS, 15th Biennial Rep., *supra,* at p. 52 ["[w]hile [BLS] has been successful in getting redress in many cases, *still our laws at present are inadequate to cover the situation*" (italics added)].)

Finally, defendant relies on *Hale v. Morgan* (1978) 22 Cal.3d 388 [149 Cal.Rptr. 375, 584 P.2d 512] (*Hale*) and other authorities in asserting that penalties are never favored by courts of law or equity and that statutes imposing penalties or creating forfeitures must be strictly construed. (*Hale,* at p. 401; see also *No Oil, Inc. v. Occidental Petroleum Corp.* (1975) 50 Cal.App.3d 8, 29 [123 Cal.Rptr. 589].)

■ These authorities and principles do not aid defendant's position. The rule of strict construction of penal statutes "has generally been applied in this state to criminal statutes, rather than statutes which prescribe only civil monetary penalties." (*People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th at p. 312.) Moreover, *Hale, supra,* 22 Cal.3d 388, "did not purport to alter the general rule that civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose." (*People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th at p. 313.)

In any event, even if there are circumstances in which civil statutes should be strictly construed, there is very little here to support defendant's proffered construction. The plain purpose of sections 201 and 203 is to compel the immediate payment of earned wages upon a discharge. As discussed, a discharge is commonly understood as referring both to an involuntary termination from an ongoing employment relationship and to a release of an employee after completion of a specified job assignment or duration of time. The statutory scheme as a whole, as well as the relevant legislative history, evince the Legislature's intent to require immediate wage payment in both types of discharge situations. Released employees generally appear no less deserving or less in need of immediate wage payment than those who are fired, and as BLS recognized in its biennial report: " 'The law imposes no

unreasonable burden upon the employer,' " and " 'it is but fair that [the employer] should[] make provision to pay his employee before hiring him, failing in which he should pay the penalty.' " (BLS, 20th Biennial Rep., *supra*, at p. 36, quoting *Moore*, *supra*, 37 Cal.App. at p. 380.) Under these circumstances, it would be inappropriate to construe these statutes as excluding an entire category of discharged employees from the protections afforded. (Cf. *Oppenheimer v. Sunkist Growers* (1957) 153 Cal.App.2d Supp. 897, 899 [315 P.2d 116] [construing section 203 as not providing for continued penalty wages after earned wages have been paid].)[10]

### CONCLUSION AND DISPOSITION

■ Excluding employees like plaintiff from the protective scope of sections 201 and 203 would mean that employees who fulfill their employment obligations by completing the specific assignment or duration of time for which they were hired would be exposed to economic vulnerability from delayed wage payment, while at the same time employees who are fired for good cause would be entitled to immediate payment of their earned wages (§ 201) and many employees who quit without fulfilling their employment obligations would have a right to wage payment no later than 72 hours after they quit (§ 202).

While we are not prepared to say the Legislature could not validly adopt a statutory scheme that operated in this fashion, our review of the relevant statutory language and the overall statutory scheme, the legislative history, and the intended purpose of the immediate wage payment legislation to address the economic vulnerability of discharged employees and potential harm to the public, leads us to conclude the discharge element of sections 201 and 203 may be satisfied either when an employee is involuntarily terminated

---

[10] Defendant makes one additional statutory point. In a different division of the Labor Code dealing with employment relations (division 3), section 2920 provides: "Every employment is terminated by any of the following: [¶] (a) Expiration of its appointed term. [¶] (b) Extinction of its subject. [¶] (c) Death of the employee. [¶] (d) The employee's legal incapacity to act as such." Citing this section, defendant suggests the Legislature was demonstrably aware that employment may end through means other than a discharge or a quitting, but made no attempt to refer to these situations in enacting sections 201 through 203. But section 2920 simply addresses the circumstances under which an employment relationship is validly terminated. It does not address the matter of employee wages; nor does it purport to create exceptions to the wage payment requirements set forth in sections 201, 202, and 203.

from an ongoing employment relationship or when an employee is released after completing the specific job assignment or time duration for which the employee was hired.[11]

The judgment of the Court of Appeal is reversed, and the matter is remanded to that court for further proceedings consistent with the views herein.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

---

[11] Although we conclude defendant effectuated a discharge within the contemplation of the statutory scheme, we express no opinion on the issue whether defendant "willfully" failed to pay wages in accordance with section 201, so as to warrant the penalty amounts plaintiff seeks pursuant to section 203.