Filed 7/14/15  P. v. Avila CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040481 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1105986) |
| v. | |
| FERNANDO ZOSIMO BARRIOS AVILA, | |
| Defendant and Appellant. | |

## I.    INTRODUCTION

Defendant Fernando Zosimo Barrios Avila appeals after a jury convicted him of aggravated sexual assault of a child and attempted aggravated sexual assault of a child. (Pen. Code, §§ 269, 664/269.)[1]  The trial court imposed a term of 15 years to life for aggravated sexual assault of a child and a consecutive five-year term for attempted aggravated sexual assault of a child, and it ordered that defendant's parole term be "for life" pursuant to former section 3000.1.

On appeal, defendant contends:  (1) child sexual abuse accommodation syndrome (CSAAS) evidence should be inadmissible for all purposes; (2) CALCRIM No. 1193 erroneously informs the jury that it may consider a CSAAS expert's testimony in

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

determining the child witness's credibility; (3) the prosecutor committed misconduct and trial counsel was ineffective for failing to object; and (4) the trial court erroneously imposed a lifetime parole obligation on defendant. We will affirm the judgment.

## II. BACKGROUND

Isabella Doe was born in 1998. In 2004, her mother, Heather P., married defendant, making him Isabella's stepfather. Heather and defendant subsequently had two children together.

### A. Isabella's Testimony

At the time of trial, Isabella was 14 years old. She testified that defendant "raped" her for the first time when she was six or seven years old and that he had raped her "[a] lot." Isabella initially testified that defendant had raped her when she was eight years old, but she later testified that she did not remember whether defendant had put his penis into her vagina when she was eight. She responded, "I think" when asked if defendant had raped her when she was nine and ten years old. She responded, "Yes" when asked if defendant had raped her when she was 11 and 12 years old, although she later testified that she did not remember if defendant had raped her when she was between the ages of eight and 12. Isabella told the police that defendant stopped raping her for two or three years after she turned eight.

At first, Isabella did not know what defendant was doing to her, although she later learned about sex in school. Defendant called it "ear" and would ask her, "Do you want me to do ear?" It hurt and she was scared—too scared to scream or yell. It always occurred in her room, at night, when her mother was in the bath. Defendant would always lock the door. On one occasion, defendant took Isabella's cell phone away from her because she would not let him rape her.

Isabella testified she did not like thinking about the rapes because she "didn't like it." Her memories of the rapes were not pleasant and she did not want to remember them.

2

### B.   Isabella's Disclosure of Abuse

In April of 2011, Isabella was having some behavior problems.  She committed a shoplifting, lied to Heather, and took money from Heather.  Heather and defendant disciplined Isabella by taking away her access to Facebook and her cell phone.

On April 21, 2011, at about 9:30 p.m., Heather got out of the bath and tried to go into Isabella's room, but the door was locked.  After Heather banged on the door, defendant opened it.  Isabella was lying on her bed.  Heather asked why the door had been locked.  Defendant said he had taken Isabella's cell phone away because it had been keeping her up at night.  Heather asked Isabella if anything inappropriate had happened.  Isabella said no.  However, Isabella later testified, defendant had been "trying to get [her] to do ear."

On April 24, 2011, Isabella exchanged text messages with her friend.  Isabella wrote that her stepfather was molesting her.  At school the next day, the friend encouraged Isabella to tell someone.  They spoke with a teacher and then with an associate principal.  The principal called the police.

Heather received a call from Isabella's school after her disclosure.  That evening, Heather told defendant what she had learned.  Defendant "took off" and did not answer her repeated phone calls.

Isabella was interviewed by the police, who then asked her to conduct a pretext call with defendant.  She called defendant and told him, "I think I might be pregnant."  Defendant told her, "No, you're not."  Isabella asked defendant why he thought she was not pregnant.  Defendant replied, "[B]ecause I never do nothing."  Isabella said, "But you came in me."  Defendant replied, "No, I didn't."

The next day, defendant met Heather at their house and agreed to turn himself in.

### C.   Defendant's Interview

Following his arrest on April 26, 2011, defendant was interviewed by Officer Patricia Jaime.  Defendant knew that Isabella had accused him of inappropriate sexual

3

conduct. He claimed that "[a]ll this started" when he and Heather took Isabella's cell phone away from her.

Defendant initially claimed he did not know about Isabella's accusations until that day, asserting that he had spent the night away from home and had his cell phone shut off. He later acknowledged that he had received the pretext call from Isabella before spending the night away from home.

Officer Jaime told defendant that Isabella had undergone a medical exam and that defendant's DNA had been found in her vagina. At first, defendant said he could not explain how that had happened. Defendant then suggested that it might have occurred because he had loaned Isabella some shorts.

Defendant subsequently told Officer Jaime that Isabella had said she would "allow herself to be touched" if defendant returned her cell phone. He then lowered her clothing or removed a blanket that was covering her, and they had sex. Defendant did not use a condom or "finish," but the sex was not forced "in any way." Defendant then asserted that there actually had not been any penetration, although he admitted that his penis did touch Isabella's vagina. Defendant also admitted that he stopped because Heather knocked on the door.

Defendant denied that there had been any prior incidents of sexual intercourse.

### D.  *Medical Evidence*

On May 4, 2011, Isabella was examined by physician's assistant Mary Ritter, who was the clinic coordinator and primary examiner at the Center for Child Protection at Santa Clara Valley Medical Center. Ritter conducted a Sexual Assault Response Team (SART) exam.

Ritter observed a narrowing of Isabella's hymen, on the bottom, where it is typical to see evidence of a penetrating injury. That area of the hymen was "quite a bit narrower" than the rest of Isabella's hymen. There was no sign of a recent injury or "fresh trauma." Penetrating injuries typically heal within a few days. Ritter's findings

4

were "highly suggestive of prior penetrating trauma," consistent with a penis inside Isabella's vagina.

Pediatrician David Kerns did a review of Isabella's SART exam and Ritter's findings. He observed a "very narrow area of hymen" that was "highly suggestive of a penetrating injury." The narrowing was "not fresh," meaning it had not occurred within the prior few days. The injury could have occurred months or years earlier, but it could also have been from a penetrating event on April 21, 2011. The narrowing could have been caused by one penetrating event or many such events. The fact that the healed tissue was rounded suggests the penetration occurred "in the past" because fresher injuries are more angular.

### E.    *Child Sexual Abuse Accommodation Syndrome*

Carl Lewis, a consultant and forensic trainer in child abuse matters, testified about Child Sexual Abuse Accommodation Syndrome (CSAAS). He described CSAAS as "a phenomenon that was observed by mental health professionals who worked with children who were disclosing having been sexually abused" and as "a descriptive term for the obstacles that many children encounter when trying to disclose sexual abuse."

CSAAS consists of five "basic discussion categories": secrecy; helplessness; entrapment and accommodation; delayed, conflicted, and unconvincing disclosure; and retraction. These are not symptoms that are looked for, as CSAAS is not an "actual syndrome," diagnosis, or disorder.[2] It is not appropriate to use these categories to determine whether a child has been sexually abused.

Secrecy refers to the fact that children experience a "sense of the secrecy of the sexually abusive act." This may be created by the offender taking advantage of a time when no one else is around, which can "send a message to the child that there must be

---

[2] In fact, Dr. Roland Summit, who first published a paper describing CSAAS, has since published a follow-up paper expressing he regrets not using the terms "list" or "pattern" instead of the term "syndrome."

something bad or wrong with the behavior." An offender may also explicitly admonish a child to keep the abuse secret.

Helplessness refers to the fact that children are usually unable to stop sexual abuse because of barriers such as the inability to physically resist or the sense that resisting will lead to punishment or other negative consequences.

Entrapment and accommodation refers to the fact that a child who is being sexually abused will often "find a way to adapt" or "put up with" the abuse. Children will often try to "project an image that nothing is wrong."

Delayed, conflicted, and unconvincing disclosure refers to the fact that a child's disclosure of sexual abuse is often "a process and not a one-time event." A child may "let out a little bit of information," then decide whether to disclose additional facts based on the adult reaction. A child may also not disclose abuse "for a long time"—sometimes, not until adulthood. A child's disclosure of sexual abuse may also result in "a great deal of attention" being focused on the child and his or her family, and it may result in the child being taken out of the home. The child may wish for a "way to go back to how things were," and the child may therefore retract his or her claim or minimize his or her description of the abuse.

### F.     Defendant's Trial Testimony

Defendant testified that he considered Isabella to be "a daughter." He denied that Isabella's allegations were true.

As to the April 21, 2011 incident, defendant claimed that he was only in Isabella's room to talk to her about her cell phone. He denied that the door had been locked.

Defendant claimed that three days before that, Isabella had threatened to accuse him of molesting her if he did not return her cell phone to her.

Defendant claimed that he did not come home after receiving Isabella's pretext call because he was spending the night with a woman who was not his wife. He claimed he did not hear a voicemail message from Heather until about 2:00 a.m.

6

When he was interviewed by the police, defendant repeatedly denied having sex with Isabella, but the officer kept accusing him, so he became frustrated and desperate. Wanting the interrogation to stop, defendant began to "tell a story," thinking that "it would end." He thought that if he "invented that lie," Officer Jaime would let him go.

### G.     Charges, Verdicts, and Sentence

By first amended information filed after the prosecution presented its case, defendant was charged with four counts of aggravated sexual assault of a child (counts 1, 3-5; § 269) and one count of sexual intercourse with a child age 10 or younger (count 2; § 288.7, subd. (a)). The amended information alleged that forcible rape (§ 261, subd. (a)(2)) was the underlying crime for the aggravated sexual assault counts. The amended information alleged that count 1 occurred during a date range when Isabella was six to eight years old, that count 2 occurred during a date range when Isabella was between eight and 10 years old, that count 3 occurred during a date range when Isabella was 11 years old, that count 4 occurred during a date range when Isabella was 12 years old, and that count 5 occurred "[o]n or about April 21, 2011."

The jury found defendant guilty of aggravated sexual assault of a child as charged in count 4 and guilty of attempted aggravated sexual assault of a child, a lesser-included offense of count 5. The jury deadlocked on counts 1 through 3.

At the sentencing hearing held on November 8, 2013, the trial court imposed a term of 15 years to life for aggravated sexual assault of a child and a consecutive five-year term for attempted aggravated sexual assault of a child. The trial court specified that defendant's parole term would be "for life" pursuant to former section 3000.1.

### III.     DISCUSSION

### A.     CSAAS Evidence

Defendant contends that CSAAS evidence should be inadmissible for all purposes in California, because "the evidence cannot possibly be limited to the description of

7

myths surrounding abuse" and because "the jury invariably will use the evidence against the defendant and in favor of conviction."

During motions in limine, the prosecution sought the admission of the CSAAS evidence, and the defense sought its exclusion. Following a hearing, the trial court ruled that the CSAAS evidence was admissible.

The California Supreme Court has recognized that in cases of alleged child sexual abuse, "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301, fn. omitted (*McAlpin*); see also *People v. Brown* (2004) 33 Cal.4th 892, 906.)

As defendant acknowledges, California courts have held that CSAAS evidence is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse. (See *McAlpin, supra,* 53 Cal.3d at pp. 1300-1301; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1383-1384, superseded on other grounds by CALJIC No. 10.41, as recognized in *People v. Levesque* (1995) 35 Cal.App.4th 530, 536-537; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116-117; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394.)

Relying on several out-of-state cases, defendant argues that the California cases need to be reexamined. (See e.g., *State v. Stribley* (Iowa Ct. App. 1995) 532 N.W.2d 170, 174 [CSAAS not accepted in scientific community as means to detect abuse];

8

*Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830, 834 [testimony about uniformity of behaviors of abused children not sufficiently established to have gained general acceptance in its particular field]; *Bussey v. Commonwealth* (Ky. 1985) 697 S.W.2d 139, 141 [CSAAS evidence not proven to be a generally accepted medical concept or a syndrome that has attained scientific acceptance]; *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557, 561-562 [CSAAS evidence not shown to be reliable and invades jury's province to determine credibility].)  We decline to do so.  To the extent our Supreme Court has recognized that such evidence may be relevant, useful, and admissible in a given case, as an intermediate appellate court, we are required to follow that precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### B.    CALCRIM NO. 1193

Defendant next contends that CALCRIM No. 1193 erroneously informed the jury that it could consider the CSAAS expert's testimony in determining Isabella's credibility.[3]  Defendant contends that the instruction "permits the jurors to consider this expert testimony as supportive of the truth of the allegations made against the defendant."

The trial court instructed the jury pursuant to CALCRIM No. 1193 as follows: "You have heard testimony from Carl Lewis regarding [CSAAS].  Carl Lewis' testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not Isabella Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

---

[3] The Attorney General argues that defendant forfeited this contention because he did not object to CALCRIM No. 1193.  Section 1259 allows appellate review of claims of instructional error which affect the defendant's substantial rights. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7.)  Accordingly, we will consider the merits of defendant's contention.

When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).) We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*Ibid.*)

CALCRIM No. 1193 is a cautionary instruction that warns the jurors that they must not consider CSAAS testimony as evidence that the defendant committed the offense. It then informs the jurors that they may use CSAAS evidence to evaluate whether the alleged victim's behavior which appeared inconsistent with being molested was actually not inconsistent. To the extent that CALCRIM No. 1193 allows the jury to consider CSAAS evidence when it evaluates the alleged victim's credibility, such evidence is relevant and admissible when an alleged victim's credibility has been attacked. (*McAlpin, supra,* 53 Cal.3d at pp. 1300-1301.) Thus, in considering the instruction as a whole (*Richardson, supra* 43 Cal.4th at p. 1028), it is not reasonably likely that the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS testimony for the improper purpose of proving that Isabella was in fact abused by defendant.

### C.     *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct by referring to facts not in evidence during closing argument—specifically, the fact that Isabella had difficulty remembering details because she was "a survivor" whose brain had "evolved" to suppress some of the memories. Defendant asserts that evidence about suppressed memory could only have come from an expert. Defendant also contends his trial counsel was ineffective for failing to object.

### 1. Proceedings Below

During argument to the jury, defendant's trial counsel referred to the fact that Isabella had given "no details, no description" of the rapes and had repeatedly responded to questions with answers such as "I don't remember," "I don't know," or "I think."

During closing argument, the prosecutor responded to the defense argument about Isabella's "poor memory." The prosecutor asked, "Why, why, why does Isabella have difficulty remembering all these things? Why does she have difficulty describing with precision each and every act that has been inflicted upon her? And the answer is very simple: she doesn't want to remember. The mind is powerful. It has evolved for survival. Isabella is a survivor, and part of that mechanism, part of her, part of it is a blessing."

### 2. Legal Principles

The general rules applying to claims of prosecutorial misconduct are as follows: "Under the federal Constitution, to be reversible, a prosecutor's improper comments must ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] ' "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citations.]' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.) When the claim of prosecutorial misconduct "is based upon 'comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]' [Citations.]" (*Id.* at p. 1001.)

As the California Supreme Court explained in *People v. Hill* (1998) 17 Cal.4th 800, it is misconduct for a prosecutor to argue facts not in evidence "because such statements 'tend[ ] to make the prosecutor his [or her] own witness—offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony,

11

"although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence." [Citations.]' [Citations.]" (*Id.* at p. 828.)

" '[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. [Citation.]' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1010, fn. omitted.)

"To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.] When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., [a reasonable probability] that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.)

### 3.    Analysis

In arguing that the prosecutor's argument constituted misconduct, defendant relies on *People v. Bolton* (1979) 23 Cal.3d 208 (*Bolton*), in which the prosecutor "twice hinted that, but for certain rules of evidence that shielded [the defendant], he could show that [the defendant] was a man with a record of prior convictions or with a propensity for wrongful acts." (*Id.* at p. 212, fn. omitted.) The court found that the prosecutor's statement "constituted improper argument, for he was attempting to smuggle in by inference claims that could not be argued openly and legally." (*Ibid.*)

12

The instant case is not similar to *Bolton*. Here, the prosecutor was responding to the defense argument about Isabella's poor memory, and his remarks were based in the evidence. Isabella had testified that she did not like thinking about the rapes because she "didn't like it," and she specifically stated that she did not want to remember them. In addition, Carl Lewis, the CSAAS expert, had testified that a child who has disclosed sexual abuse will often minimize his or her later descriptions of the abuse because of the negative attention and impact of the initial disclosure. Thus, the prosecutor's argument was based in the evidence adduced during the trial.

Additionally, the jury was instructed that the attorney's statements were not evidence and that it should decide the case based only on the evidence presented at trial.[4] "In the absence of evidence to the contrary, we presume the jury understood and followed the court's instructions" and did not base its verdicts on any statement by the prosecutor. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 635.)

### D.    *Parole Obligation*

Defendant contends the trial court erroneously imposed a lifetime parole obligation on him pursuant to former section 3000.1, subdivision (a)(2). He contends that the lifetime parole obligation would only have applied if he had been convicted of violating both section 269 (aggravated sexual assault of a child) and section 288.7 (sexual intercourse with a child aged 10 or younger).

At the time of defendant's offenses, section 3000.1, subdivision (a)(2) provided: "Notwithstanding any other provision of law, in the case of any inmate sentenced to a life term under subdivision (b) of Section 209, if that offense was committed with the intent to commit a specified sexual offense, Sections 269 ***and*** 288.7, subdivision (c) of Section 667.51, Section 667.71 in which one or more of the victims of the offense was a

---

[4] The jury was instructed: "You must decide what the facts are. It is up to all of you and you alone to decide what happened, based only on the evidence that has been presented to you in this trial."

13

child under 14 years of age, or subdivision (j), (*l*), or (m) of Section 667.61, the period of parole, if parole is granted, shall be the remainder of the inmate's life." (Stats. 2010, ch. 219, § 20, eff. Sept. 9, 2010, emphasis added.)

Effective January 1, 2015, section 3000.1, subdivision (a)(2) now provides: "Notwithstanding any other law, in the case of any inmate sentenced to a life term under subdivision (b) of Section 209, if that offense was committed with the intent to commit a specified sexual offense, Section 269 *or* 288.7, subdivision (c) of Section 667.51, Section 667.71 in which one or more of the victims of the offense was a child under 14 years of age, or subdivision (j), (*l*), or (m) of Section 667.61, the period of parole, if parole is granted, shall be the remainder of the inmate's life." (Stats. 2014, ch. 280, § 2, emphasis added.)

The parties dispute the meaning of the word "and" which appeared between the references to sections 269 and 288.7 in former section 3000.1, subdivision (a)(2). Defendant contends the word "and" was used in the conjunctive sense, with the result that only persons convicted of violating *both* sections 269 and 288.7 were subject to mandatory lifetime parole. The Attorney General contends the word "and" was used in the disjunctive sense, equivalent to the word "or," with the result that any persons convicted of violating *either* sections 269 or 288.7 were subject to mandatory lifetime parole.

### 1. Principles of Statutory Interpretation

"[O]ur fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute. [Citation.] We begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.] The language must be construed 'in the context of the statute as a whole and the overall statutory scheme, and we give "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' [Citation.] In other words, ' "we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of

14

which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" ' [Citation.] If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences. [Citation.]" (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 (*Smith*).)

It is a "basic principle of statutory and constitutional construction . . . that courts, in construing a measure, not undertake to rewrite its unambiguous language. [Citation.] That rule is not applied, however, when it appears clear that a word has been erroneously used, and a judicial correction will best carry out the intent of the adopting body. [Citation.] The inadvertent use of 'and' where the purpose or intent of a statute seems clearly to require 'or' is a familiar example of a drafting error which may properly be rectified by judicial construction. [Citations.]" (*People v. Skinner* (1985) 39 Cal.3d 765, 775-776.) Whether the use of the word "and" is, in fact, a drafting error "can only be determined by reference to the purpose of the section and the intent of the electorate [or legislature] in adopting it." (*Id.* at p. 776.)

### 2.  Legislative History Materials[5]

Prior to 2010, former section 3000.1 provided for a lifetime parole period only "[i]n the case of any inmate sentenced under Section 1168 for any offense of first or second degree murder . . . ." (Stats. 2001, ch. 854, § 50.)

In 2010, the Legislature amended former section 3000.1 as part of "Chelsea's Law." (See *People v. Soto* (2011) 51 Cal.4th 229, 237, fn. 4.) The 2010 legislation

---

[5] Pursuant to the Attorney General's request, we have taken judicial notice of several documents in the legislative history of former section 3000.1.

added former section 3000.1, subdivision (a)(2), which made a number of sex offenses subject to lifetime parole. (Stats. 2010, ch. 219, § 20, eff. Sept. 9, 2010.)

The legislative history of the 2010 amendments shows that the Legislature intended that the lifetime parole requirements would apply to persons, like defendant, who are convicted of aggravated sexual assault of a child (§ 269), with no requirement that such persons also be convicted of sexual intercourse with a child aged 10 or under (§ 288.7).

An early analysis of the proposed legislation stated, "This bill increases parole to lifetime parole for the following offenses: . . . sexual intercourse; oral copulation; or sodomy with a child 10 years of age or younger [§ 288.7 violators]; . . . aggravated sexual assault of a child [§ 269 violators] . . . ." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1844 (2009-2010 Reg. Sess.) as amended Apr. 13, 2010, p. 23.)

As amended on July 15, 2010, the proposed legislation specified, "This bill would require lifetime parole for habitual sex offenders and persons convicted of specified sex crimes, including, among others, aggravated sexual assault of a child." (Assem. Bill No. 1844 (2009-2010 Reg. Sess.), as amended July 15, 2010.) As of July 15, 2010, the proposed legislation would have enacted a lifetime parole requirement on "any inmate sentenced to a life term under Section 269, subdivision (c) of Section 667.51, Section 667.71 in which one or more of the victims of the offense was a child under 14 years of age, or subdivision (j), (*l*), or (m) of Section 667.61." (*Id*., § 19.)

When the proposed legislation was amended to add the reference to section 288.7, the Legislative Counsel's digest still specified that the bill would require lifetime parole for persons convicted of "specified sex crimes, including, among others, *aggravated sexual assault of a child*." (Assem. Bill No. 1844 (2009-2010 Reg. Sess.), as amended August 2, 2010, emphasis added.) The digest did not state that lifetime parole would be required for persons convicted of aggravated sexual assault of a child only if the person was also convicted of sexual intercourse with a child aged 10 or younger.

16

An analysis of Assembly Bill No. 1844 prepared after the above amendment noted that the bill would "[r]equire lifetime parole for habitual sex offenders; persons convicted of kidnapping a child under the age of 14 with the intent to commit a specified sex act; and persons convicted of specified sex crimes, including the sexual assault of a child." (Analysis by Gabriel Caswell of Assem. Bill No. 1844 (2009-2010 Reg. Sess.), as amended Aug. 20, 2010, pp. 1-2.) The analysis separately listed the crimes that would be subject to lifetime parole, specifying that they would include "[s]exual intercourse, oral copulation, or sodomy with a child 10 years of age or younger" *and* "[a]ggravated sexual assault of a child." (*Id.*, p. 14.)

### 3. Recent Legislative Action

As noted above, effective January 1, 2015, section 3000.1 was amended to replace "and" with "or," so that the lifetime parole requirement now clearly applies to persons convicted of either section 269 or section 288.7. (Stats. 2014, ch. 280, § 2.) The legislative history of this amendment reveals that the Legislature considered the prior wording of the statute to have been unintentional: according to one committee report, "the conjunctive 'and' between 269 and 288.7 appears to have been an error or oversight." (Senate Comm. on Public Safety, Analysis of Assem. Bill No. 1438 (2013-2014 Reg. Sess.), as amended June 3, 2014, p. 9.)

### 4. Analysis

Based on our application of the settled principles of statutory construction and our review of the pertinent legislative history of former section 3000.1, we conclude that the word "and" as used in the phrase "Sections 269 and 288.7" in former section 3000.1, subdivision (a)(2) was a drafting error.

First, the meaning of "and" in former section 3000.1, subdivision (a)(2) is not clear and unambiguous in context. (See *Smith, supra,* 39 Cal.4th at p. 83.) Former section 3000.1, subdivision (a)(2) listed a number of sex offenses that are subject to life terms, for which lifetime parole was required. Section 269 and section 288.7 are both

17

offenses that are punishable by life terms.  Thus, in context, the word "and" could mean that someone convicted of section 269 *and* someone convicted of section 288.7 *each* would be subject to lifetime parole, or it could mean that someone convicted of violating *both* section 269 *and* section 288.7 would be subject to lifetime parole.  Therefore, we turn to the legislative history.

As explained above, the legislative history of the 2010 amendment to section 3000.1 indicates the Legislature intended the lifetime parole requirement to apply to persons convicted of violating section 269 *or* section 288.7.  Nothing in the legislative history of former section 3000.1 indicates that the Legislature intended lifetime parole to apply to those offenses only if the person was convicted of both section 269 and section 288.7.

Further, the subsequent amendment to section 3000.1 indicates that the Legislature intended to require lifetime parole of persons convicted of violating section 269 *or* section 288.7.  (See *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [circumstances of subsequent amendments "can indicate that the Legislature made material changes in statutory language in an effort only to clarify a statute's true meaning"].)  As noted in the report quoted above, in amending the statute effective January 1, 2015, the Legislature acknowledged that "the conjunctive 'and' between 269 and 288.7 appears to have been an error or oversight."  (Senate Comm. on Public Safety, Analysis of Assem. Bill No. 1438 (2013-2014 Reg. Sess.), as amended June 3, 2014, p. 9.)

In sum, we conclude that the word "and" as used in the phrase "Sections 269 and 288.7" in former section 3000.1, subdivision (a)(2) should be read as the word "or," such that defendant, who was convicted of section 269, is—as ordered by the trial court—subject to lifetime parole.

## IV.   DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P. J.

WE CONCUR:




_____
MIHARA, J.




_____
GROVER, J.




*People v. Avila*
**H040481**