Filed 1/6/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL ALAN GRAY, as Co-Trustee, etc. et al., | |
| Plaintiffs and Appellants; | E059761 |
| MARTHA JIMENEZ, as Co-Trustee, etc. | (Super.Ct.No. INP015818) |
| Plaintiff and Respondent, | OPINION |
| v. | |
| JEWISH FEDERATION OF PALM SPRINGS AND DESERT AREA, | |
| Defendant and Appellant; | |

APPEAL from the Superior Court of Riverside County.  James A. Cox, Judge.

Affirmed.

Russell L. Davis for Plaintiffs and Appellants.

---

[*]  Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of section II, parts B through F.

1

Law Offices of Michael Zitomer and Michael Zitomer for Plaintiff and Respondent.

Schlecht, Shevlin & Shoenberger, John C. Shevlin; and Michael S. Kahn for Defendant and Appellant.

Plaintiff and appellant Laura Gray[1] was the sole net income beneficiary of the Edward B. Cantor Trust (the Cantor Trust). Defendant and appellant, the Jewish Federation of Palm Springs and the Desert Area (Jewish Federation) was one of three remainder beneficiaries of the Cantor Trust. Cantor died in August 1991. The main asset of the Cantor Trust was an interest in commercial rental property located on Arville Street in Las Vegas, Nevada (Arville). In 2001, respondent Martha Jimenez was appointed the trustee of the Cantor Trust. In 2005, Gray was appointed co-trustee along with Jimenez.

In 2007, Gray and Jimenez made an attempt to provide an appropriate accounting to the remainder beneficiaries of the Cantor Trust when Jimenez wanted to resign as trustee. Jewish Federation objected to the accounting. Gray filed several other amended accountings to which Jewish Federation objected. Gray was advised to prepare an accounting that addressed the income and principal that was distributed by the Arville management company. Gray filed a Petition for Instructions to Ascertain Beneficiaries to the Cantor Trust (the Petition) seeking a determination that Jewish Federation was a

---

[1] On February 27, 2015, Laura Gray passed away; we granted the motion for substitution of attorneys, substituting Michael Alan Gray and Michelle Frances Holguin as they are co-executors of Laura Gray's will. For clarity and ease of reference, with no disrespect intended, we refer to Laura Gray in the body of this opinion.

proper remainder beneficiary as the name of the beneficiary in the trust documents was Project Exodus. The Petition was denied as "bogus." Gray was ordered removed as the co-trustee of the Cantor Trust on March 25, 2009. Gray and Jimenez filed one more accounting. Jewish Federation's objections were set for trial.

Gray appealed her removal as trustee and also the trial court's order that she must provide a complete accounting of distributions to income and principal from the management company for Arville. In our prior unpublished opinion *Martha Jimenez et. al. v. Jewish Federation of Palm Springs* (August 4, 2010, E048898 [nonpub. opn.]), we denied Gray's arguments finding that an accounting from the management company was necessary and that the trial court properly removed Gray as the trustee.

The case was remanded. Gray and Jimenez filed two additional accountings for the time period they were trustees; Jewish Federation objected and a trial date was set. After a trial, the trial court found that Gray had to reimburse the Cantor Trust for items improperly distributed to income rather than principal; was ordered to pay Jewish Federation's attorney's fees for unreasonable and bad faith opposition to Jewish Federation's objections to the accountings and for filing the Petition; and Gray was ordered to repay the Cantor Trust for trustee fees she was paid. Jimenez was relieved from any liability.

Gray contends on appeal as follows: (1) Probate Code section 16373 [2] required that disbursements for extraordinary repairs, tenant allowances, leasehold improvements,

---

[2] All further statutory references are to the Probate Code unless indicated.

and broker's commissions be allocated to principal; (2) there is no statutory authority to apportion broker's commissions, tenant allowances, and leasehold improvements over the initial term of the lease; (3) Gray, in her capacity as co-trustee, is not liable for attorney's fees under section 17211, subdivision (b), as she did not file any opposition in bad faith to the Jewish Federation's objections to her accountings; (4) "The trustees' opposition to an objection that they failed to set aside a reserve for depreciation is not without reasonable cause nor in bad faith" (all caps. omitted); (5) Gray had a right to file the Petition and it should not have been considered to have been filed without reasonable cause or in bad faith; and (6) the trial court erred by denying Gray a right to trustee fees and the fees of her attorney, which were incurred to defend the Cantor Trust.

Jewish Federation filed a cross-appeal. It contends that the trial court erred by relieving Jimenez of liability for breaches of duty and finding no bad faith on her part.

**I**

**FACTUAL AND PROCEDURAL HISTORY**

A.      <u>FACTS LEADING TO FIRST APPEAL</u>

As amended on February 21, 1989, Edward B. Cantor created an inter vivos trust, which effectively provided that the net income of the residuary trust estate upon his death be distributed to his friend, Gray, during her lifetime. Upon Gray's death, 50 percent of the corpus of the trust was to be distributed to Project Exodus. The primary asset of the trust was a 21 percent undivided interest in Arville. Arville was held as tenants in common. In addition, Gray owned a 36 percent interest in her own name.

4

When Cantor died, two trustees managed the Cantor Trust: Robert Murray and Helen Mae Rose. Rose resigned on November 17, 2000. On April 18, 2001, Gray and the remainder beneficiaries entered into a stipulation to appoint Jimenez as the successor trustee. On November 22, 2005, Jimenez filed a petition to appoint Gray the co-trustee because Gray was very active in the day-to-day operations of Arville. Gray was appointed the co-trustee. On September 18, 2006, Jimenez sought to be removed as the co-trustee.

On February 28, 2007, Gray petitioned the court for approval of an accounting by co-trustee Jimenez for the period of March 1, 2001, through January 31, 2007. On April 26, 2007, Jewish Federation objected to the accounting on the grounds that (1) the period between February 14, 2006, and January 31, 2007, was not presented by both co-trustees; (2) Jimenez did not file a bond as required by a stipulation entered into on April 18, 2001; and (3) the format failed to meet the guidelines of the Probate Code. On June 12, 2007, Gray filed an amended accounting (First Amended). Jewish Federation objected. On August 27, 2007, Jimenez was allowed to resign.

On October 4, 2007, Gray filed a second amended petition for approval of accounting (Second Amended). Jewish Federation objected on the grounds: (1) there were unexplained differences between the first and second accounting; (2) the accounting failed to explain how the distributions to the life income beneficiary were calculated; (3) it did not allocate any depreciation or reserve for principal disbursements for payments of income from principal; (4) did not account for reserves obtained from a refinance of Arville; and (5) there were disbursements to Gray personally rather than as

5

co-trustee, which failed to allocate between principal and income. Gray agreed to file an amended accounting. Richard Jandt was appointed co-trustee.

A third amended accounting (Third Amended) was filed on July 14, 2008. Jewish Federation objected to the accounting as follows: (1) rent incomes were distributed from the management company at Arville directly to Gray without a proper determination of net income; (2) there was no reserve for depreciation; (3) the co-trustees did not provide an accounting from the Arville management company, only the net income received; (4) dispersal of income receipts by the Arville management company directly to Gray personally and not as co-trustee; (5) no accounting for Arville management company's cash balance; (6) there was payment of attorney's fees out of the trust for Gray's personal legal matters; (7) failure to appropriately account for fees paid and requested by Gray as co-trustee; and (8) reimbursements to Gray that did not appear to be for the benefit of the trust.

Gray's counsel contended at the hearing on August 15, 2008, that the accounting was correct and addressed all the previous objections. The trial court found that Jewish Federation's objections were well taken. Gray was receiving the full amount of rent but no expenses were taken out. It appeared Gray had been overpaid. Jewish Federation was concerned that the accounting did not address what the Arville property manager was doing with the money. The trial court ordered a fourth amended accounting.

The fourth amended accounting (Fourth Amended) was filed on October 2, 2008. Jewish Federation objected that the accounting failed to address the receipts and disbursement of the management company that operated Arville. The management

6

company was receiving rent income, security deposits, and had refinanced Arville. The management company was receiving principal and income as defined in the Uniform Principal and Income Act (§ 16320, *et seq*.) (the Act). The transactions needed to be analyzed to determine the allocations to income and principal.

At the hearing, the trial court admonished Gray that Jewish Federation was asking for the back-up figures on Arville management company's dealings and it was entitled to such figures. Gray's counsel argued that the management company was an independent company and Gray, as the trustee, had accounted for the trust. Gray posited that an audit of the management company would be required. The trial court advised Gray's counsel that such audit must be done, and if it was not done, Gray would be removed as co-trustee and sanctioned. Further, if it was not provided, then Gray may be held in contempt.

A fifth amended accounting was filed on January 27, 2009 (Fifth Amended). Gray cited to section 16352 as grounds that she did not have to provide an accounting from the Arville management company because it was a business entity. It was within Gray's discretion to account separately for the management company; she need only account for the income disbursements to her. Jewish Federation again filed objections for failure to account for security deposits, roof repairs, and an accounting of the Arville management company.

The trial court found that Arville was not a business entity; it was a tenancy in common. Nothing in section 16350 exempted Gray from providing an accounting of the management company. The trial court believed that there had to be an accounting of the

7

amount of money received by the management company, the expenses and the disbursements to Gray, and the other owners. The trial court believed that such documentation existed. Gray's counsel stated that there had been a computer problem at the management company and the backup figures were lost. Gray also stated that Jimenez never received an accounting from the Arville management company while she was the trustee.

The trial court noted that Gray had been asked to provide the appropriate accounting three to four times. The Fifth Amended accounting was rejected, Gray was removed as co-trustee, Jandt became the sole trustee, and a trial was set on Jewish Federation's objections to the Fifth Amended accounting.

Further, on November 18, 2008, prior to the first appeal, Gray filed the Petition. Gray contended that the Cantor Trust provided for the remainder beneficiary to be Project Exodus; it was not clear that Jewish Federation was the appropriate beneficiary. Gray asked that the trial court determine the remainder beneficiaries. Gray verified the Petition. The Petition was denied by the trial court. The trial court expressed concern that the Petition was brought by Gray to rid herself of "an objector to her activities as co-trustee." The trial court also noted that Gray had previously in her capacity as co-trustee acknowledged Jewish Federation as the rightful beneficiary.

B.    FIRST APPEAL

In Gray's first appeal to this court, she argued the trial court erred by finding that Arville was not a business entity, and by removing her as co-trustee. We affirmed the

8

trial court's ruling finding that Arville was not a business entity. We also rejected that all distributions must automatically be allocated to income.

We also concluded that the trial court properly removed Gray as the co-trustee based on her failure to provide a separate accounting from the Arville management company despite repeatedly being asked to provide such accounting. There was no way to determine the appropriate allocation of receipts and expenses without a full accounting of the Arville management company. We found that the accountings filed by Gray did not appropriately account for security deposits, depreciation, repairs, improvements, reserves, and refinancing of the property, which would substantially affect allocation of receipts and expenses. We found her statement that the records were lost "suspect." Gray did not appeal the denial of the Petition. The case was remanded.

C.     JEWISH FEDERATION'S PETITION TO SURCHARGE TRUSTEES

Jewish Federation's Petition to Surcharge Trustees and for Attorney's Fees (the Surcharge Petition) was filed on December 2, 2010. Jewish Federation contended that the actions of Jimenez and Gray in failing to provide the appropriate accounting caused waste, delay, misuse of Cantor Trust funds, and was an attempt to cover up Jimenez's misappropriation of trust funds. Jewish Federation sought attorney's fees under section 17211, subdivision (b).

D.     ADDITIONAL ACCOUNTINGS

On December 16, 2010, the sixth amended accounting was filed by Gray (Sixth Amended). It covered the period of 2001 through 2008. There was a breakdown of the principal and income for the years 2001 through 2006, and a separate accounting for

9

2006 through 2008. It also included amounts paid for repairs and services on Arville; disbursements for legal fees to Best, Best and Krieger (BB&K); disbursements for accounting services; and amounts paid to Gray as trustee fees.

Jewish Federation objected. Once again it faulted Gray and Jimenez for not setting up a reserve or depreciation account by transferring income to principal. It recognized the account was discretionary, but asserted Gray could not exercise her discretion in favor of the Cantor Trust because she would not benefit as the net income beneficiary. Jewish Federation also argued, citing sections 16370 and 16371, that there were inappropriate principal and income allocations. Jewish Federation set forth the amounts that needed to be charged against income and not principal.[3] Jewish Federation also asked that the trial court reject that Gray was entitled to attorney's fees paid out of the Cantor Trust.

Gray and Jimenez filed a response to the objections to the Sixth Amended accounting. They argued that in 1998 the trial court rejected that a reserve for depreciation was required. Jewish Federation could not raise the argument as it was already decided. Further, Gray and Jimenez justified all of the expenses for items allocated to principal. Gray contended that section 16373, subdivision (b)(3) should be applied to determine which items should be charged to principal. Gray also set forth that the accountings were not done in bad faith or in order to thwart court orders. Both Gray and Jimenez verified the response to the objections.

_____

[3] The figures need not be discussed as they are not relevant to the issues raised by Gray on appeal.

10

Gray filed a seventh amended accounting (Seventh Amended), which merely corrected an error on the Sixth Amended accounting. Jewish Federation raised the same objections against the Seventh Amended accounting. Jimenez and Gray filed the same response to the objections. Gray and Jimenez filed objections to Jewish Federation's Surcharge Petition. They argued there was not a breach of trust with a resulting loss. Jewish Federation could not show bad faith.

E.     TRIAL

Prior to trial, the parties argued the issue of allocation of principal and income within the meaning of sections 16370, 16371, and 16373, which we will discuss in more detail *post*. The objections to the Seventh Amended accounting were heard along with the Surcharge Petition.

Jimenez testified she became the sole trustee in 2001. Jimenez had never been a trustee. Gray's lawyer, David Erwin, prepared the paperwork in order for Jimenez to be appointed. Erwin never advised her of her fiduciary duties as a trustee. She signed a letter claiming to have trust experience, but she did not have any experience. At the time Jimenez was appointed, Richard Artz was the property manager for Arville. Artz was also an accountant. He collected rents and paid the expenses. She received no compensation from the Cantor Trust and resigned in 2006.

When she wanted to resign, Jimenez hired an accountant to do a final accounting. Jimenez gave the accountant her checkbook and bank statements for the Cantor Trust and nothing else. She also gave tax returns from 2001 through 2006, given to her by Artz, to the accountant. She was told by Erwin the accounting was wrong. She hired another

11

accountant, Linda Sinclair, who prepared another accounting. Jimenez was told the accounting prepared by Sinclair was also rejected; Jimenez was not asked to do another accounting. Jimenez relied on the accountants and lawyers to file the appropriate accountings. Artz never gave her a complete accounting of Arville despite her asking him for one for several years. Jimenez did not participate in the Cantor trust after 2007.

Jimenez was advised to file a bond as the trustee in 2001 but did not file the bond until 2007. Jimenez did recall giving Gray's counsel permission to represent her on the Sixth and Seventh Amended accountings. No one asked for an accounting until 2006. Once Jewish Federation filed the Surcharge Petition asking for money from Jimenez, she got her own attorney.

John Shevlin was an attorney who was specialized in trusts and estates; he represented Jewish Federation on the first appeal. Gray did not raise the issue of the denial of the Petition on appeal. Shevlin's total bill was $54,782.52.

David Erwin testified that he was a partner with the law firm BB&K. Erwin's firm represented Gray starting in 2000. Erwin did recall at some point meeting with Jimenez. Erwin insisted he advised Jimenez, prior to her appointment, of her fiduciary duties. Erwin represented Jimenez in 2006 when she was ordered to do an accounting and file a bond. Jimenez was appointed in 2001. Jimenez did not file an annual accounting until 2007; she did not file a bond until 2007. Erwin knew that Jimenez had no experience as a fiduciary.

Gillett Henry Welles was a lawyer employed by BB&K. Welles started working with Gray in 2008. Gray was a difficult client. Welles submitted the Third and Fourth

12

Amended accountings to the court. Gray instructed him to file them although he had some questions. However, Welles believed that the accountings provided the proper information. After the Fourth Amended accounting, Russell L. Davis started advising Gray. An email was sent from Davis to Welles advising him that they should file the Petition to put Jewish Federation on the defensive. The Petition was filed four days after the email. Welles filed the Petition. Welles felt they had to file the Petition; it was authorized by Gray.

John Maxwell was an accountant. Maxwell tried to present an accounting that addressed Jewish Federation's objections to the Third Amended accounting. He admitted that he did not have records for the Arville management company going back to 2001. Maxwell did not have extensive experience in trust accounting. Gray advised Maxwell she could not find the Arville records.

Robert Baltes was an accountant who also was hired by Welles to do the Fourth Amended accounting. Baltes was to address the objections to the accounting. He did not contact Jimenez. Gray got him whatever documents she could obtain from the Arville accounting manager. Baltes did not have all the receipts and disbursements.

Gray testified. Gray relied upon Davis that the first appeal needed to be filed. Gray relied on the accountants and Erwin in filing the earlier accountings. She relied upon Davis in filing the Sixth and Seventh Amended accountings.

Jimenez agreed to be co-trustee, even though she would not be compensated, because she liked "challenges." Gray assumed she had experience as a fiduciary. Gray asked Jimenez for accountings but never received a proper accounting. Gray did not

13

recall if she was informed by Erwin that a yearly accounting was required. Gray was made co-trustee just to help Jimenez until a new trustee could be found.

Gray insisted she did everything to try to get the proper accounting including going to the bank, and hiring lawyers and accountants. Gray insisted that Jimenez was in sole control between 2001 and 2006.

Gray admitted she provided documents, that were kept in her garage with the Fifth Amended accounting; these included tenant leases and repairs. She filed large binders of the documents with the trial court. Gray got additional boxes out of her garage for the Seventh Amended accounting. The documents came from Artz but she was not sure when she received them. Gray received income and expense statements from Arville management as a co-trustee starting in 2000. She put them in the boxes in her garage and home.

Gray wanted the Petition filed to ascertain whether Jewish Federation was Project Exodus. Project Exodus helped Russian Jews return to Israel. Cantor wanted to help the organization. However, there no longer was an issue as to Jews leaving Russia. Gray was not sure if Jewish Federation was Project Exodus but the Petition was necessary because the reason for donating to the charity no longer existed. The appeal was filed with her permission. Gray acknowledged that she signed a replacement of trustee Rose in December 2000. It listed the beneficiaries as Jewish Federation, also known as Project Exodus. It was filed with the court.

She relied on the accountants and attorneys to prepare all of the accountings; she relied on their conclusions. She felt all the information in the binders filed with the Fifth

14

Amended accounting addressed the trial court's concerns regarding what was done on Arville. Gray said that between 2001 and 2006 she would contact the Arville management company monthly to check on the amount of her distribution.

At one point, the trial court admonished Gray to answer questions without making any additional comments. She was not helping her credibility by the way she was acting in court.

Michael Kahn, Jewish Federation's counsel, testified. He billed Jewish Federation for attorney's fees in the amount of $176,818.75. Scott Sklar also represented Jewish Federation. He had fees of $43,312.50. Kahn believed that Gray had all of the records in her home but refused to do the accounting. The trial court at this point noted that just attaching the tax returns and giving the court several binders of invoices and receipts was not an appropriate accounting.

Davis, Gray's attorney, also testified. He was hired in 2008. Davis thought the first appeal was meritorious. Davis claimed that the issue of Jewish Federation's right as a beneficiary had never been established. Davis always got Gray's approval for any legal action. Davis had Gray review the appeal. After the appeal, Davis asked Kahn if the tax returns from Arville could be used for an accounting and Kahn stipulated to their use.

F.     STATEMENT OF DECISION

The trial court entered its statement of decision on July 2, 2013. The trial court noted that Gray was involved in the day-to-day operations of the trust when Jimenez was the trustee. The trial court had been involved with the Cantor Trust since 2005. The trial court noted, "In all of the nearly 16 years this judge has heard probate calendars, this

15

court has seen few trust accounting proceedings wherein the trustees have so obstinately refused to address the sustained objections to the filed accounts as the trustees have done in this proceeding." The trial court faulted Gray with having filed binders with over 1,000 pages of receipts and checks with the Fifth Amended accounting, expecting the trial court to conduct the accounting. The trial court faulted the "trustees," specifically Gray, with claiming to have lost records and blaming the multiple accountings on the advice of counsel. As trustees, they were tasked with keeping proper records. The court noted that a trustee who does not keep proper records or fails to file a proper accounting can be liable for breach of fiduciary duty, attorney's fees, damages and contempt; it cited to sections 16060 and 17211, subdivision (b).

The trial court found the first two accountings filed were not done in bad faith. However, the filing of the Third Amended accounting and all further accountings were filed in direct violation of the court's order to prepare a proper accounting, including the records of the Arville management company. Gray testified she had boxes of receipts and expenses in her garage, and that she received monthly expense and income statements from Arville starting in 2000. The trial court noted, "Why these records were not utilized to prepare the proper account is a mystery."

The trial court found that the direct violation of the trial court's orders was bad faith, and caused the remainder beneficiary to incur great expense to obtain the information. The trial court required Gray to pay attorney's fees to Jewish Federation for the Third, Fourth, Fifth and Sixth Amended accountings.

16

The trial court noted that Gray filed the Petition on her own. The evidence at trial and the earlier proceedings supported that the Petition was filed in order to rid Gray of an objector to the accounting. Gray presented the defense that she followed the advice of counsel. However, Gray in her own verified pleadings, which were filed with the trial court since 2000, showed she had acknowledged Jewish Federation was a remainder beneficiary. The trial court did note the issue was ultimately abandoned on appeal. It assessed Gray 10 percent of Jewish Federation's attorney's fees for the appeal and all of the fees paid by Jewish Federation to object in the trial court.

The trial court additionally found no evidence was presented that contradicted Jewish Federation's assertion the principal was overcharged. Gray was to return the trustee fees she was paid. The court found Gray's conduct as trustee "deficient, improper, in breach of her duty of impartiality, and outrageous in the delays." The trial court also ordered that the two other remainder beneficiaries must share equally in the attorney's fees that were not being reimbursed to Jewish Federation. That amount would be deducted upon Gray's death.

The trial court also found that despite Jimenez being the named trustee from 2001 through 2006, Gray was in fact operating and acting as the trustee. Jimenez was acting as trustee but in a "lesser role." The trial court noted it found that Gray was not forthcoming in her testimony and was intentionally evasive. There was no indication of bad faith on the part of Jimenez. Jimenez was held jointly responsible for costs.

The final judgment order set forth all of the awarded fees and the approval of the Seventh Amended accounting. The judgment included the decision that disbursements

17

for repairs, tenant allowances, leasehold improvements and broker's commissions were chargeable to income. The expenses could be apportioned over the term of the lease. Based on this determination, Gray was owed $47,913.58 in underpaid income. The principal was overcharged $61,749.01. Gray would pay the difference out of income.

Gray was to pay $28,000 in attorney's fees to Jewish Federation for bad faith and unreasonable objections to accountings pursuant to section 17211, subdivision (b). Gray was to pay $12,709.45 to Jewish Federation for the objections and appeal to the Petition. Gray was to reimburse the Cantor Trust $12,608 for her trustee fees. One-half would be charged to income, and the other one-half to principal.

Payment was to come from the distributable income in the Cantor Trust. Any additional amount owed would be obtained from the succeeding accounting period. Gray's own petition to surcharge Jewish Federation for the attorney's fees incurred on behalf of the Cantor Trust was denied.[4] Gray filed her notice of appeal.

## II

## DISCUSSION

### A.    PROBATE CODE SECTION 16373

Gray contends the trial court erred by concluding that the expenses for leasehold improvements; broker commissions; expenses to prepare the spaces for rent; and capital improvements, such as a new roof, should have been allocated to income under section 16373. She insists the trial court erred by concluding that section 16373 allowed for the

---

[4] This petition does not appear in appellant's appendix.

18

trustee to borrow from principal to pay excessive income expenses but that such amounts must be paid back. She interprets section 16373 to provide that the items listed in that section were to be charged to principal, and the trial court improperly found they were chargeable to income. She also claims that the amounts to be paid back out of income could not be spread across the term of the lease.

### 1. *ADDITIONAL FACTUAL BACKGROUND*

The Cantor Trust provided that the principal and income should be distributed in accordance with the Act. The trial court held a hearing to determine the proper interpretation of the Act. The trial court first acknowledged that it could not force the trustee to set aside a reserve from income to fund depreciation. However, by not setting up the fund, the trial court felt it could surcharge Gray for the amounts where principal was used to pay income expenses.

The trial court noted that section 16370 defined those items that should be charged to income; section 16371 defined principal disbursements; and that section 16373 referred to the discretion to regularize income payments by allowing the trustee to pay large expenses from principal, but that the principal must be paid back over time.

Gray's counsel argued that section 16373 defined those items that were chargeable to principal. Gray also argued that by looking at the code section superseded by section 16373, section 16312, it was clear that the items in section 16373 were to be charged to principal. It was very clear the prior section referred to what was to be paid out of principal. The trial court interpreted section 16373 to mean that it allowed the trustee to pay expenses for income expenses from principal but the expenses had to be paid back.

19

This was done to regularize income for the income beneficiary. The trial court relied on the Law Review Commission Comments to determine the meaning of section 16373.

The trial court believed that section 16373 was not a definitional statute. However, the trial court recognized that even an accountant could be confused by the Act and that it took reading the statute several times, and the Law Review Commission's Comment, to help understand it.

### 2. *SECTION 16373 REGULARIZES DISTRIBUTATION*

Here, the trial court found that the income was undercharged in the accounting, based on its interpretation of section 16373. It concluded that disbursements for repairs (whether extraordinary or not), tenant allowances, leasehold improvements and broker's commissions are chargeable to income. It also found, "All expenses listed in Probate Code § 16370 (c) are chargeable solely to income and are not apportionable under Probate Code § 16373."

"We review issues of statutory interpretation de novo. [Citation.] The primary purpose of statutory construction is to ascertain the Legislature's intent. [Citation.] We first consider the statutory language, 'being careful to give the statute's words their plain, commonsense meaning.' [Citation.] 'If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary.' [Citation.] If our analysis of the statutory language 'leaves doubt about its meaning, we may consult other evidence of the Legislature's intent, such as the history and background of the measure.'" (*Soria v. Soria* (2010) 185 Cal.App.4th 780, 786.)

Section 16370 sets forth a list of items that shall be chargeable to income.[5] These items include half of the regular compensation of the trustee, and ordinary expenses incurred in connection with the administration, management and preservation of trust property. (§ 16370, subds. (a) & (c).) Section 16371 sets forth the list of items that shall be disbursed from principal. Section 16373 provides in pertinent part follows: "(a) If a trustee makes or expects to make a principal disbursement described in this section, the trustee may transfer an appropriate amount from income to principal in one or more accounting periods to reimburse principal or to provide a reserve for future principal disbursements. [¶] (b) Principal disbursements to which subdivision (a) applies include the following, but only to the extent that the trustee has not been and does not expect to be reimbursed by a third party. [¶] (1) An amount chargeable to income but paid from principal because it is unusually large, including extraordinary repairs. [¶] (2) A capital improvement to a principal asset, whether in the form of changes to an existing asset or the construction of a new asset, including special assessments. [¶] (3) Disbursements made to prepare property for rental, including tenant allowances, leasehold improvements, and broker's commissions."[6]

The Law Revision Commission comments to section 16373 include the following language: "The sources of Section 504 [Prob. Code, § 16373] are Section 13(b) of the

---

[5] Income is defined as "money or property that a fiduciary receives as current return from a principal asset." (§ 16324.)

[6] We have found no cases interpreting section 16373 and the parties have provided no cases.

1962 Act [former Prob. Code § 16312(c)], which permits a trustee to 'regularize distributions.'" If charges against income are unusually large, by using 'reserves or other reasonable means' to withhold sums from income distributions; Section 13(c)(3) of the 1962 Act [former Prob. Code § 16312(d)(3)], which authorizes a trustee to establish an allowance for depreciation out of income if principal is used for extraordinary repairs, capital improvements and special assessments; and Section 12(3) of the 1931 Act, which permits the trustee to spread income expenses of unusual amount 'throughout a series of years.' Section 504 [Prob. Code, § 16373] contains a more detailed enumeration of the circumstances in which this authority may be used, and includes in subsection (b)(4) the express authority to use income to make principal payments on a mortgage if the depreciation charge against income is less than the principal payments on the mortgage."

Former section 16312, subdivision (c) provided, "If charges against income are of unusual amount, the trustee may by means of reserves or other reasonable means charge them over a reasonable period of time and withhold from distribution sufficient sums to regularize distributions."

Based on the language of section 16373, and the Law Revision Commission Comments, it is reasonably interpreted to state that if an amount is to be distributed from income, such as a broker's commission on a new lease, but there is not enough income to pay for the item and maintain disbursements to the income beneficiary, the trustee can pay for the items out of the principal. However, the trustee must pay back the principal over time for the use of principal to pay income expenses if it did not set up a reserve to pay for the items. Although the statute uses the term "principal disbursement," it is

22

clearly intended to mean those items paid for out of principal, but for which they must be paid back from income.

The trial court believed that the section essentially authorized the trustee to use the principal account as a lender/bank in order to be able to pay large charges that were to be paid by income but still have money to distribute to the net income beneficiary. The definitions for what is chargeable to income and principal are clearly found in sections 16370 and 16371. Such an interpretation is the most reasonable based on looking to the statutory scheme as a whole. In determining the meaning of a statute, "[t]he language must be construed 'in the context of the statute as a whole and the overall statutory scheme, and we give "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.'" [Citation.] In other words, "'we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.'"'" (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.)

Gray contends that section 16373 defines those items that are chargeable to principal. She relies on former section 16312, subdivision (d), which provided language that, "[t]he following charges shall be made against principal: [¶] (2) . . . expenses for preparation of property for rental or sale . . . . [¶] (3) Extraordinary repairs or expenses incurred in making a capital improvement to principal . . . ." However, section 16373 superseded section 16312, subdivision (d)(3). Further, based on the wording of section 16373, and reading it in conjunction with sections 16370 and 16371, which are statutes defining what *shall* be charged to income and principal, it is clear that this statute

23

authorizes the use of principal for some disbursements, but those disbursements must be paid back by income. The trial court properly interpreted section 16373.

### 3. *APPORTIONMENT OVER LEASE TERM*

In addition, Gray appears to contend that the trial court erred by ruling that disbursements for broker's commissions, tenant allowances and leasehold improvements may be subject to being apportioned over the initial term of the lease and any portion that exceeds the period of income interest is chargeable to principal. Gray insists that there is no statutory authority for such a proposition.

In its statement of decision, the trial court found, "With regard to the Arville property, broker's commissions, tenant allowances and leasehold improvements may be subject to being apportioned over the initial term of the lease, and any portion which exceeds the period of the income interest[7] is chargeable to principal." Section 16373 clearly supports this determination. It provides that an amount from income can be transferred in one or more accounting periods. (§ 16373, subd. (a).) There was no error occasioned by the trial court's ruling.

---

[7] "Income interest" is defined as "the right of an income beneficiary to receive all or part of net income, whether the trust requires it to be distributed or authorizes it to be distributed in the trustee's discretion." (§ 16326.)

24

B.     ATTORNEY'S FEES AWARDED TO JEWISH FEDERATION UNDER

SECTION 17211, SUBDIVISON (B) FOR OBJECTIONS TO

ACCOUNTINGS

Gray insists that the trial court erred by finding she acted in bad faith, and that her oppositions to the objections to the Third, Fourth, Fifth and Sixth Amended accountings filed by Jewish Federation were unreasonable within the meaning of section 17211, subdivision (b).  She insists the court proceedings confirm that she voluntarily attempted to resolve all objections and did not oppose the objections until the Fourth Amended accounting was filed.

The trustee of a trust has a duty to keep the beneficiaries of the trust reasonably informed of the trust and its administration.  (§ 16060.)  To this end, the trustee shall provide an accounting to the beneficiaries at least annually and upon certain specified events, including upon a change of trustee.  (§ 16062, subd. (a).)  The accounting must comply with statutory requirements, including the requirements that it contain a statement of receipts and disbursements, a statement of assets and liabilities, and a disclosure of the trustee's compensation.  (§ 16063, subds. (a), (b).)

"If a beneficiary contests the trustee's account and the court determines that the trustee's opposition to the contest was without reasonable cause and in bad faith, the court may award the contestant the costs of the contestant and other expenses and costs of litigation, including attorney's fees, incurred to contest the account.  The amount awarded shall be a charge against the compensation or other interest of the trustee in the trust.  The trustee shall be personally liable and on the bond, if any, for any amount that remains

25

unsatisfied." (§ 17211, subd. (b).) As explained in *Estate of Bonaccorsi* (1999) 69 Cal.App.4th 462, 473, "where successful, the beneficiaries must bear their own attorney fees in contesting an accounting of an estate. An exception exists only where the administrator opposes the contest 'without reasonable cause and in bad faith.'"

In determining reasonable cause within the meaning of section 17211, it "does not require an objectively reasonable belief, based on the facts then known to the trustee, that the trustee would be completely exonerated. Instead, . . . reasonable cause to oppose a contest of an account requires an objectively reasonable belief, based on the facts then known to the trustee, either that the claims are legally or factually unfounded or that the petitioner is not entitled to the requested remedies. Conversely, there would be no reasonable cause to oppose a contest of an account only if all reasonable attorneys would have agreed that the opposition was totally without merit, or, in other words, no reasonable attorney would have believed that the opposition had any merit." (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 927.) Whether there is reasonable cause is a legal question. "Any controversy as to what facts were known . . . presents a question of fact for the trier of fact." (*Ibid.*) On review of these claims, "[W]e independently review the trial court's finding on the existence of reasonable cause absent any factual dispute as to [the trustee]'s knowledge at the time." (*Ibid.*)

We note that Gray spends an inordinate amount of time explaining, as to the initial accounting through the Fifth Amended accountings, that she either did not understand the objections, that it was Jimenez's obligation to file the accountings, or that she voluntarily agreed to amend the accountings without filing any opposition. Essentially she argues

26

that the objections were not clear and that she had filed the appropriate accountings. However, in our prior opinion, we noted that the trial court was within its discretion to require a more detailed accounting. We also noted that all of the prior accountings failed to account for several items including reserves, depreciation, and security deposits. We have already determined that they were not proper accountings and will not reconsider the issue. The only issue in the trial was whether such refusal to follow the trial court's orders was done in bad faith or without reasonable cause.

Gray admitted at trial that she received monthly income and expense statements for Arville starting in 2000. She kept those records in her garage. She also had other records received from Arville, including receipts for repairs, in her garage. Despite this information, she represented to the court at the hearing on the Fourth Amended accounting that the records could not be obtained because the computers had crashed at the Arville management company. The trial court noted that starting with the Third Amended accounting, it was clear the accounting had to contain the income and expenses pertaining to Arville. The trial court felt it was a "mystery" why the records possessed by Gray were not used in the accountings.

Further, Gray attached some records to the Fifth Amended accounting, but there were thousands of pages and the trial court was expected to do the accounting. This was not a proper accounting and it was in violation of the trial court's order. The trial court properly determined that Gray should be responsible for the attorney's fees incurred by Jewish Federation in objecting to the accountings.

27

Moreover, despite Gray only being appointed co-trustee from 2006 through 2008, it was apparent to the trial court, and this court, that Gray was directing all matters of the Cantor Trust beginning at least in 2001. Jimenez testified that she was instructed only to write a check to Gray, and had no prior experience as a trustee. Further, Jimenez had a very limited role in the accountings after the First Amended accounting. Gray voluntarily provided all of the accountings after the First Amended accounting.

The trial court could reasonably conclude that Gray was acting as the trustee prior to her appointment as co-trustee based on her involvement in the day-to-day operations.

Finally, the trial court made the factual determination that the objections by Jewish Federation and the request for an accounting were sufficiently clear after the Second Amended accounting. Such determination was not an abuse of discretion. As such, any accounting done after the Second Amended accounting, which was done in direct violation of the court's order, was not done with reasonable cause.

Moreover, the Third, Fourth, Fifth and Sixth Amended accountings were filed in bad faith. Bad faith concerns the trustee's subjective state of mind. (*Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th at p. 926, fn. 47.) Advice of counsel cannot be a "'mere cloak to protect one against a suit.'" (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 54.) These accountings, as found by the trial court, were done in violation of the court's order to provide an accounting of the Arville management company. Further, Gray admitted to having access to the records as early as 2000, and did not explain why a detailed accounting using those records was not prepared earlier. Her accountants and attorneys cannot be faulted for filing these accountings without the records when it

28

appeared they were unaware she possessed more detailed records. Moreover, there was no explanation in the Sixth Amended accounting as to how Gray suddenly was able to provide more information regarding the repairs and receipts.

Gray also claims that she did not file any opposition to the objections until the Fourth Amended accounting. We assume her argument is that attorney's fees could not be ordered under section 17211, subdivision (b) because an opposition must be filed based on the language of the statute.

"[S]ection 17211[, subd. ](b) is a remedial statute and therefore must be liberally construed." (*Soria v. Soria*, *supra*, 185 Cal.App.4th at p. 786.)

In *Leader v. Cords* (2010) 182 Cal.App.4th 1588, 1591 (*Leader*), the beneficiaries sought attorney's fees under section 17211, subdivision (b) for a petition to compel a distribution. The court found that under section 17211, subdivision (b), the language provided that it was a "contest to the trustee's account" that was eligible for attorney fees. In *Leader*, "[t]he trustee's account . . . revealed that the trust had remaining assets and no liabilities. The trustee, however, refused to make a final distribution based on a collateral dispute that did not pertain to the trust. The beneficiaries successfully petitioned the probate court for an order compelling the trustee to distribute the remaining assets. The sole question on appeal [was] whether the court erred by finding section 17211, subdivision (b) is inapplicable as a matter of law because the proceeding [did] not constitute a contest of the trustee's account." (*Leader*, at p. 1591.)

The *Leader* court concluded that based on the language and purpose of section 17211, the beneficiaries were entitled to attorney's fees despite not technically filing

29

opposition to objections to accounting. It noted that "[a] remedial statute '"must be liberally construed 'to effectuate its object and purpose, and to suppress the mischief at which it is directed.'"'" (*Leader*, *supra*, 182 Cal.App.4th at p. 1598.) The court concluded, "We do not envision that the Legislature intended to leave beneficiaries . . . without potential recourse under section 17211, subdivision (b), for the unreasonable and bad faith opposition to a petition for distribution, merely because they do not challenge the accuracy of the account's enumerated receipts and distributions, or assets and liabilities. Such a narrow reading of 17211, subdivision (b) would defeat its remedial purpose. Accordingly, we conclude the court misinterpreted section 17211, subdivision (b) as inapplicable . . . ." (*Id*. at p. 1599.)

Here, there is no doubt that each of the objections filed by Jewish Federation contested the accounting of the trustee. Although Gray did not file written opposition to the objections until the Fourth Amended accounting, she quickly filed amendments that never addressed or provided an appropriate accounting despite having the documents to support the income and expenses. As we found in our prior opinion, the trial court properly concluded that she had not provided appropriate accountings. Gray's tactics in filing amended accountings that continued to defy the court's orders and to which Jewish Federation had to file objections certainly qualifies under section 17211, subdivision (b).

The trial court properly imposed attorney's fees of $28,000 against Gray.

C.     RESERVE FOR DEPRICIATION

Gray's next argument is entitled, "The trustees' opposition to an objection that they failed to set aside a reserve for depreciation is not without reasonable cause nor in

bad faith." (All caps. omitted.) Gray provides authority for the fact that setting aside reserves for depreciation is discretionary. She also contends that she consistently provided, with all of the accountings filed in the trial court, the income tax returns from Arville in the form of a "Schedule E," which was identical to information that is required under the federal tax form "Schedule C."[8] She insists she never took trust property without accounting for it. She also states that any reasonable attorney would find Jewish Federation's claim that she was required to set aside a reserve for depreciation lacked merit. Gray then concludes, "For this reason, Gray has requested an award of attorney fees pursuant to Section 17211(a) which was denied by the court."

Gray's argument is unintelligible. Although Gray attempts in the reply brief to clarify that she is entitled to trustee and attorney's fees for the work she did in defending the Cantor Trust, the opening brief is indecipherable. Although it does appear that Gray filed a petition to surcharge Jewish Federation for attorney's fees and trustee fees, it is not included in the record. We note the trial court did provide that Gray's attorneys could be paid out of income and principal in the amount of $41,849.15. It is entirely unclear as to what attorney's fees Gray is claiming she should have been paid. Jewish Federation was unable to decipher the argument and was unable to respond appropriately. An appellant must "'present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised . . . of the exact question

---

[8] On May 27, 2014, Gray filed a motion for judicial notice of a blank Schedule C tax form to support this argument that she has always provided a proper accounting. We deny the motion as it is not relevant to the issues raised on appeal. (*People ex.rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2.)

31

under consideration, instead of being compelled to extricate it from the mass.'" (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.) We reject the claim.

> D.    ATTORNEY'S FEES PAID TO JEWISH FEDERATION FOR THE
>        OPPOSITION TO THE PETITION TO ASCERTAIN BENEFICIARIES
>        OF THE CANTOR TRUST

Gray further contends that the trial court should not have ordered her to pay Jewish Federation's attorney's fees to oppose the Petition. She insists it was filed with reasonable cause and was not filed in bad faith.[9] She sought a clarification that Jewish Federation was also known as Project Exodus. We have set forth section 17211, subdivision (b), *ante*.

The trial court provided in its statement of decision that Gray acted in bad faith in filing the Petition because she had acknowledged Jewish Federation as a remainder beneficiary since 2000. It was clear that she only filed the Petition in order to avoid providing a proper accounting.

Assuming that Gray had standing to file the Petition, no reasonable attorney would have believed that the Petition had any merit. (*Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th at p. 927.) For years, Gray had acknowledged that Jewish Federation was also known as

---

[9] We note that such Petition is not listed in section 17211 as a basis for awarding attorney's fees. However, Gray has not raised a claim that it was not appropriate to award attorney's fees under section 17211, subdivision (b). Moreover, Jewish Federation has described the Petition as opposition to their objections to accounting, which would clearly fall under section 17211, subdivision (b). In her reply brief, Gray does not dispute this characterization of the Petition.

32

Project Exodus. She continually filed amendments to the accountings based on objections by Jewish Federation. She did not appeal the denial of the Petition in the first appeal. Based on the circumstances, Gray acquiesced in filing the Petition in order to rid herself of her objector. The evidence she presented, that she was only following the advice of her attorneys, was not credible. This constituted bad faith. The trial court properly ordered Gray to pay the attorney's fees incurred by Jewish Federation for objecting to the Petition.

    E.    DENIAL OF TRUSTEE FEES

Gray disputes the trial court's determination that she was not entitled to any trustee fees. She also insists that she could not be held liable for any actions prior to 2006, when Jimenez was the trustee.

Initially, Gray appears to make an additional argument that she was entitled to her attorney's fees for defending the Cantor Trust. However, she does not detail the attorney's fees. As noted *ante*, the trial court allowed $41,849.15 to be paid to Gray's attorneys out of the Cantor Trust. We simply cannot determine what amount of attorney's fees she was denied.

As for the refusal to grant her trustee fees, the trial court ordered Gray to reimburse the Cantor Trust $12,608 for fees she took for performing as the trustee. It found that her conduct as co-trustee had been "deficient, improper, in breach of her duty of impartiality, and outrageous in delays of performance of her duties" within the meaning of California Rules of Court, rule 7.776. She was to receive no compensation.

33

California Rules of Court, rule 7.776, provides for a trustee to be compensated as follows: "In determining or approving compensation of a trustee, the court may consider, among other factors, the following: [¶] (1) The gross income of the trust estate; [¶] (2) The success or failure of the trustee's administration; [¶] (3) Any unusual skill, expertise, or experience brought to the trustee's work; [¶] (4) The fidelity or disloyalty shown by the trustee; [¶] (5) The amount of risk and responsibility assumed by the trustee; [¶] (6) The time spent in the performance of the trustee's duties; [¶] (7) The custom in the community where the court is located regarding compensation authorized by settlors, compensation allowed by the court, or charges of corporate trustees for trusts of similar size and complexity; and [¶] (8) Whether the work performed was routine, or required more than ordinary skill or judgment." (See also *Estate of Nazro* (1971) 15 Cal.App.3d 218, 221.)

"'Allowance of compensation rests in the sound discretion of the trial court, whose ruling will not be disturbed on appeal in absence of a manifest showing of abuse.'" (*Estate of Gump* (1991) 1 Cal.App.4th 582, 597.) In setting fees and compensation, it is within that courts province to consider the conduct of the trustee in the management of the trust property. (*In re Estate of McLellan* (1939) 35 Cal.App.2d 18, 22.) "Compensation may be reduced or denied where the trustee acts negligently or in breach of the trust." (*Gump*, at p. 597.) We review these matters for an abuse of discretion. (*Estate of McLaughlin* (1954) 43 Cal.2d 462, 465; *Gump*, at p. 597.)

The trial court reasonably determined that Gray had failed to provide an accurate accounting of Arville, the only asset in the Cantor Trust. Further, she hid documents and

34

was not forthcoming in her trial testimony. Gray's negligence in managing the trust was grounds to deny her compensation.

Gray's further contention that she should not be responsible for any acts prior to 2006 when Jimenez was the trustee lacks merit. As previously stated, the trial court reasonably could find that Gray was acting as the trustee and that Jimenez was not managing the trust. Gray was involved in the day-to-day operations and was receiving the accounting from Artz. However, she refused to disclose that accounting to the remainder beneficiaries. Additionally, Jimenez never received any compensation as trustee, which was further evidence that she was not acting as the trustee. Moreover, if Gray was not acting as the trustee from 2001 through 2006, she would not be entitled to any compensation during that time period.

The court clearly acted within its discretion in considering Gray's conduct when evaluating whether she should have received trustee fees for managing the only asset in the Cantor Trust, Arville. We find no error in the court's refusal to grant trustee fees.

F.     LIABILITY OF JIMENEZ

Jewish Federation claims that the trial court erred by absolving Jimenez of liability for her actions while the appointed trustee. In particular, Jewish Federation claims that she should be held jointly responsible with Gray for the $28,000 in attorney's fees awarded to it for filing objections to the accountings.

The trial court in its statement of decision found, "There was no indication of any bad faith on the part of Jimenez. Liability in the matters discussed above, are ascribed to Gray and not to Jimenez, including for such periods in which Jimenez was the named

35

trustee. The court relieves Jimenez for liability for the breaches of duty mentioned above, in the interest of justice and pursuant to [section] 16440[, subdivision ](b). Jimenez shall, however, remain jointly responsible for awarded costs." (Boldface omitted.)

Section 16440, subdivision (a) provides, "If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: (1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest. [¶] (2) Any profit made by the trustee through the breach of trust, with interest. [¶] (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust." Subdivision (b) of section 16440 provides that "If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The trial court's determination of liability is reviewed for abuse of discretion. Under this standard, "'[d]iscretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

As stated by Jimenez in response to this claim, all of the attorney's fees imposed were under section 17211, subdivision (b). No loss to the trust was alleged or proven.

36

None of the fees were imposed based on Jimenez's, or even Gray's, breach of trust pursuant to section 16440.

Here, Gray was found liable for the attorney's fees for the accountings under section 17211, subdivision (b). This required, as detailed *ante*, a showing of bad faith. The trial court found no bad faith was proven as to Jimenez. Jimenez never received a complete accounting from Artz while she was trustee. Further, no evidence established Jimenez was aware that Gray possessed records that would assist with the accounting.

Jewish Federation details breaches of trust committed by Jimenez, including that she lied about her experience and she never obtained any records from Arville. Jewish Federation insists that none of the problems with the accountings would have arisen had Jimenez just provided an accounting the first year that she was the trustee. This failure to provide these accountings was the reason the trial court awarded the attorney's fees. Her failure to provide accountings constituted bad faith. Jewish Federation additionally argues that by abandoning her duties, Jimenez should be held responsible.

We disagree with Jewish Federation's claims. First, it is pure speculation that had Jimenez provided a first accounting, none of the other accountings would have been required. Further, there simply was no showing of bad faith by Jimenez within the meaning of section 17211, subdivision (b). As admitted by Jewish Federation, although Jimenez was the named trustee, Gray was managing the Cantor Trust. Finally, even if we were considering that Jimenez abandoned her duties, we would not find this constituted bad faith within the meaning of section 17211, subdivision (b). We affirm the trial

court's statement of decision rejecting that Jimenez was liable for attorney's fees under section 17211, subdivision (b).

## III

## DISPOSITION

We affirm the judgment. Jewish Federation, as the prevailing party on appeal, is awarded its costs on appeal. Jimenez, as the prevailing party on the cross-appeal, is awarded her costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION

MILLER
J.

We concur:

KING
Acting P. J.

CODRINGTON
J.

38